867 So.2d 849 (2004)
STATE of Louisiana, Appellee
v.
Christopher VAN SALES, Appellant.
No. 38,138-KA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2004.
*851 Louisiana Appellate Project by Carey J. Ellis, III, for Appellant.
J. Schuyler Marvin, District Attorney, Melissa Sugar, Dale Montgomery, II, Assistant District Attorneys, for Appellee.
Before CARAWAY, PEATROSS & MOORE, JJ.
PEATROSS, J.
Defendant, Christopher Van Sales, and David Matthew Waters were charged with the second degree murder of their friend, Greg Farmer, in violation of La. R.S. 14:30.1. Defendant pled not guilty and a unanimous jury subsequently convicted him as charged. Defendant was sentenced to a term of life imprisonment without benefits. Defendant now appeals, arguing that the evidence was insufficient to sustain the conviction and that the trial court erred in denying defense counsel's challenge for cause of one of the prospective jurors. For the reasons stated herein, Defendant's conviction is affirmed.

FACTS
Evidence adduced at trial revealed that, on the evening of January 11, 2001, Defendant *852 left the home he shared with his girlfriend, Angela Gilmore, at about 8:00 p.m. in Gilmore's 2000 Cougar automobile. He was wearing yellow wind pants, a shirt and shoes at the time. Defendant told Gilmore that he was going to "hang out" with his friends, the victim, Gregory Farmer, and/or Waters (also known as "Snotty"). He did not return home again until 1:00 or 2:00 the next morning, and he was wearing different clothesjeans and a different shirt. Gilmore never saw the yellow pants again.
Michael Gorman testified that, on January 11, 2001, he and Richard Hollis, Waters and Defendant were at Waters' trailer home in Haughton "doing drugs"using the methamphetamine that Hollis had cooked. Gorman mentioned to the others that he thought that Farmer was a "snitch," citing discovery documents which he claimed showed that Farmer was a confidential informant for the police in a criminal case pending against him.[1] Waters and Defendant decided to go looking for Farmer; but, before they left the trailer, at Defendant's request, Hollis gave him a stainless steel knife with a four-inch blade.
At about 8:00 or 8:30 that evening, Farmer visited his best friend, Casey Crews, at her apartment in Bossier City. Farmer and Crews had made tentative plans to go out that night; but, instead, Farmer, Crews and Crews' boyfriend "hung out" at her apartment for a while. Farmer left Crews' apartment for a short while to visit a friend and, while he was gone, Waters telephoned Crews' home looking for Farmer. When Farmer returned to Crews' apartment, he attempted to telephone Waters. Farmer and Crews noted at the time that it was "weird" that Defendant was with Waters because Defendant was not old enough to "go out."
Later, Waters and Defendant arrived at Crews' apartment looking for Farmer. They took Farmer into the bathroom to talk, apparently confronting him about Gorman's accusation that he was a snitch. After about five minutes, Waters, Defendant and Farmer came out of the bathroom; and, according to the testimony of Crews and Waters, it was obvious that Farmer was upsethe was hitting his fists together and telling Waters and Defendant, "Take me to him." Farmer further stated that he did not have anything to prove, but he still wanted to go with Waters and Defendant to see Gorman. The three left Crews' apartment shortly thereafter; this was the last time Crews saw the victim alive. Farmer did, however, telephone Crews later that night to tell her that, if anything happened to him, he was at the end of Busby Road. Crews testified that Farmer sounded worried during the call.
Back at Waters' trailer, Gorman heard Hollis answer a telephone call. After hanging up the telephone, Hollis told Gorman that Defendant, Waters and Farmer were on their way to the end of Busby Road (near the trailer), and they wanted Gorman to meet them down there so Gorman and Farmer could fight. Gorman declined to join them, saying that he wanted nothing to do with it.
Waters testified that he was at his trailer with Hollis, Gorman and Defendant on the evening of January 11, 2001, getting ready to go out to a club with Farmer. Waters had been good friends with Farmer and his family for years. Waters had also been friends with Defendant for a long time. Waters testified that he let Hollis live in his trailer so Hollis could supply Waters' drug habit. There was a *853 methamphetamine lab set up in the rear bedroom of Waters' trailer and Hollis cooked the drug. Each of the men at Waters' trailer that evening admitted that they were doing drugs that night. At trial, Waters corroborated Gorman's testimony regarding Gorman's statement that Farmer was a snitch. When Waters left the trailer to pick up Farmer to go out, Defendant asked if he could go with him to confront Farmer. Defendant drove Gilmore's car and Waters rode with him. Waters related at trial how he and Defendant found the victim at Crews' apartment and confronted him in the bathroom. As previously stated, Farmer denied the accusation to Waters and Defendant and said he wanted to confront Gorman. Not wanting a fight at the trailer, Waters and Defendant left Farmer at the end of Busby Road and returned to Waters' trailer to tell Gorman that Farmer wanted to confront him. A few minutes later, according to Waters, Farmer walked up to Waters' trailer and banged on the front door trying to get Gorman to come out, but Gorman refused. As Waters was trying to calm Farmer down on the front porch, Farmer told Waters that he did not want to go out anymore and Waters asked Defendant to take Farmer home. Waters rode with them in Gilmore's Cougar.
Instead of taking Farmer home, however, Defendant drove to the end of Little League Road and stopped the car. Defendant explained that he wanted to show them a shortcut to a house that he and Waters had talked about robbing. The three men got out of the car, but Defendant told Waters he wanted to talk to Farmer alone and asked Waters to leave. Waters then drove the Cougar to a Circle K store in Haughton and bought some beer. After a short while, Waters drove back to pick up Defendant and Farmer. Waters did not see anyone as he stopped the car, so he got out of the car, urinated, and, as he was returning to the car, saw one person running toward the car. Defendant, who was alone, jumped into the passenger side of the car. From the interior car light, Waters saw that Defendant had blood all over him and had a knife in his hand. Waters testified that he could smell the blood and kept asking Defendant where Farmer was and what had happened. Defendant told Waters that he "had to do it" and yelled at him to "just drive." Waters, who was in shock and who was now afraid of Defendant, drove back to the trailer. As Waters questioned Defendant about what had happened, Defendant answered, "Snotty, just calm down. I did this before I know (sic) what I'm doing. Just chill out."
At the trailer, Defendant showered, changed clothes and put the bloody clothes (including some yellow wind pants) into a trash bag. Defendant wore Waters' blue jeans, white tee shirt, a flannel shirt and some black Avirex tennis shoes. Waters gave Defendant a can of lighter fluid and the trash bag, and he and Defendant left the trailer in Waters' car. Waters drove Defendant to Bellevue Road and left him there for about 30 minutes. After Waters returned for Defendant and the two got back to Waters' trailer, Defendant left in Gilmore's Cougar to go home.
On the morning of January 12, 2001, Farmer's body was discovered by a walker off Little League Road in Bossier Parish. Farmer's leather jacket was found with a puncture-type tear near the zipper area and there was a pool of blood on the edge of the blacktop road. The body was located between two logs some distance away. Between the pool of blood and the logs was more blood and drag marks. Farmer was found in the fetal position, with his pants pulled down to his ankles apparently from being dragged by the arms through the mud and brush. Several pieces of physical *854 evidence were removed from the scene, including cigarette butts, a beer can and a knife that was found in the middle of the road about 100 feet away from the scene.
A subsequent autopsy revealed that Farmer died of multiple penetrating stab and incised wounds penetrating the head, neck and torso, resulting in massive blood loss. A total of 50 sharp force wounds were on his body, including at least one incised wound. The primary series was the sharp force wounds to the neck and head, including 21 total stab and incised wounds. These wounds included one involving the brain, a deep incised wound of the neck which transected the right external jugular vein and a stab wound to the throat which transected the left internal jugular vein. The primary series also included sharp force wounds of the torso, including five stab wounds involving the lung, mesenteric artery, retroperitoneum and a large incised wound to the central chest. There were 23 total small shallow incised wounds of the central chest. The body also had a sharp force stab wound to the back of the left hand. Blunt force injuries included multiple contusions, abrasions and small lacerations of the face, and multiple shallow vertically oriented parallel abrasions consistent with movement of the body over an abrasive surface.
The investigation led to the questioning and arrests of Waters and Defendant. Waters gave a statement to police about what transpired.[2] Waters' statement to police that he drove to the Circle K store in Haughton and bought some beer was corroborated by the store surveillance camera and the store clerk. After obtaining a search warrant for Waters' trailer, investigators discovered a "meth" lab in the rear bedroom and seized other evidence from the automobile.
The investigation also revealed a "burn scene" located approximately 100 feet into the woods off Bellevue Road. The residue from the burn indicated that clothing, including shoes, had recently been burnt. Several foot impressions were discovered at the burn scene and castings were made thereof. The castings matched the shoes that Defendant was wearing at the time of his arrest.
DNA analysis conducted by the Northwest Louisiana Crime Lab of blood samples removed from the passenger seat of Gilmore's Cougar automobile were matched to the victim. The knife recovered from near the crime scene, however, did not contain any of the victim's DNA. Also, Hollis testified that the knife found at the scene was not the same knife that he gave to Defendant that night.
While incarcerated, Defendant told his cellmate, Michael Knight, the gruesome story of how he and his "fall partner" were involved in the "homicide" of the victim, Greg Farmer. Defendant told Knight that they had received a discovery package that included Farmer's name as an informant in some drug arrests. Defendant related to Knight that they planned to pick up Farmer, carry him to a secluded place and beat him up because Farmer was a snitch and "deserved to die." Defendant described to Knight how he and his fall partner drove Farmer to a dead-end road and he instructed his fall partner to leave in the car. At this point, Defendant related that he and Farmer got into an argument over Farmer being an informant and "he just snapped," lashed out and stabbed/sliced Farmer in the throat. Defendant admitted to Knight that he slashed or stabbed *855 Farmer in the throat multiple times and that Farmer was gurgling blood; so, in an attempt to put his friend out of his suffering, Defendant attempted to stab Farmer in the chest and stomped his head. Defendant stated that, when Farmer stopped gurgling, he dragged his body into a cut-over area and attempted to cover him with limbs. Defendant also told Knight that a knife was found at the scene, but it was not the knife he used. Defendant said that the knife he used would never be found because it was at the bottom of the river. He also told Knight how his "fall partner" took him to change clothes and then to the woods to burn the clothes he wore during the homicide. Knight testified at trial regarding this story told to him by Defendant and noted that Defendant did not appear to feel badly about what he had done to Farmer, but felt badly for Farmer's family.
As previously stated, after a trial by jury, Defendant was unanimously convicted as charged. Defendant's motions for new trial and post-verdict judgment of acquittal were heard and denied and he was ultimately sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. This appeal ensued.

DISCUSSION
On appeal, Defendant raises the following two assignments of error (verbatim):
1. The State failed to present sufficient evidence to support the verdict, a conviction of second degree murder.
2. The Trial Court erred by failing to grant Defense (sic) challenge for cause of prospective Juror Arthur Berquist.
Sufficiency of evidence
Defendant argues that, of the 18 witnesses who testified for the State, none were eyewitnesses to the incident. He contends that, although there was evidence that the parties had been arguing and were upset on the evening of January 11, 2001, there was no evidence that he intended to kill or inflict great bodily harm upon Farmer before the two were alone on Little League Road.
The State asserts that the sequence of events and circumstances unique to this case point to no other rational conclusion than Defendant's guilt of second degree murder. It asserts that the defense has presented no reasonable hypothesis of innocence.
The question of sufficiency of evidence was properly raised by a motion for post-verdict judgment of acquittal. See State v. Howard, 31,807 (La.App.2d Cir.8/18/99), 746 So.2d 49, writ denied, 99-2960 (La.5/5/00), 760 So.2d 1190. When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in *856 such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30, 903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Turner, 591 So.2d 391 (La.App. 2d Cir.1991), writ denied, 597 So.2d 1027 (La.1992).
In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. As an evidentiary rule, the statute restrains the fact finder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Hammontree, 363 So.2d 1364 (La.1978).
The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
Second-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 96-1991 (La.2/21/97), 688 So.2d 521.
Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Ellis, supra. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La. 1983); State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020; State v. Ellis, supra; State v. Knowles, 598 So.2d 430 (La.App. 2d Cir.1992). The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Knowles, supra.
In State v. Mackens, 35,350 (La. App.2d Cir.12/28/01), 803 So.2d 454, writ denied, 02-0413 (La.1/24/03), 836 So.2d 37, cited in State v. Miller, 36,003 (La.App.2d Cir.7/25/02), 824 So.2d 1208, writ denied, 02-2480 (La.6/27/03), 847 So.2d 1253, this court found that it was reasonable for the jury to conclude that the defendant had the specific intent to kill or cause great *857 bodily harm to support the conviction of second degree murder, given the number and nature of the victim's stab wounds.
Manslaughter is a lesser included offense of second degree murder. La. C. Cr. P. art. 814 A(3). A homicide which would otherwise be second degree murder is manslaughter when it is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. "Sudden passion" or "heat of blood" are not elements of the crime of manslaughter, but are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when a homicide is committed without them. State v. Scott, 31,379 (La.App.2d Cir.10/28/98), 720 So.2d 415, writ denied, 99-0170 (La.5/14/99), 741 So.2d 664, reconsideration denied, 99-0170 (La.9/3/99), 747 So.2d 529; State v. Stewart, 26,168 (La.App.2d Cir.8/17/94), 641 So.2d 1086, writ denied, 94-2363 (La.1/13/95), 648 So.2d 1337. Also, State v. McCray, 621 So.2d 94 (La. App. 2d Cir.1993).
A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. State v. Lombard, 486 So.2d 106 (La.1986); State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, writ denied, 00-0989 (La.3/23/01), 787 So.2d 1008, citing State v. McCray, supra. In reviewing a defendant's claim that he has met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Lombard, supra; State v. Robinson, supra; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797. See also State v. Scott, supra.
When the evidence does not support a conviction of the crime charged, but supports a conviction on a lesser and included offense, this court is authorized to enter a judgment of guilty of the lesser and included offense. State v. Maxie, 33, 982 (La.App.2d Cir.11/1/00), 773 So.2d 198.
In the case sub judice, we find that the facts and circumstances presented at trial in the form of witness testimony and physical evidence were such that the existence of the main fact, that Defendant had the requisite specific intent to kill or to inflict great bodily harm, may be inferred according to reason and common experience. See State v. Lilly, supra; State v. Turner, supra. Defendant stabbed and/or cut Farmer 50 times. Given the number and nature of the victim's stab wounds, we find it was reasonable for the trier of fact to determine that Defendant had the specific intent to kill or inflict great bodily harm upon this victim. See State v. Miller, supra; State v. Mackens, supra. This finding is bolstered by Defendant's cellmate's testimony, which indicated that Defendant and Waters planned to take the victim to a secluded place and beat him up because the victim was a snitch and "deserved to die." Further, the fact that Defendant armed himself with a knife before going to confront Farmer supports a finding of specific intent as well. After evaluating the evidence in the light most favorable to the prosecution, we find sufficient circumstantial evidence to support the jury's inference that Defendant had the requisite specific intent for a conviction of second degree murder.
We further find that, when viewed in the light most favorable to the prosecution, the evidence does not support that *858 the possible alternative hypothesis (that the defendant proved mitigation sufficient to entitle him to a verdict of manslaughter) is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Davis, supra; State v. Owens, supra. Defendant argues that "tempers were flying" that evening and emphasizes that Farmer was very angry and ready to fight over being accused of being a snitch. He uses this fact to argue that he and Farmer got into a fight and he killed Farmer in a "rage" of sudden passion such that his conviction should be of manslaughter rather than second degree murder. On this record, we cannot say that the jury was unreasonable in concluding that Defendant did not prove these mitigating factors by a preponderance of the evidence. This assignment of error is without merit.
Challenge for cause to juror Berquist
During voir dire, prospective juror Arthur Berquist revealed that one of the State's potential witnesses, Gorman, was a neighbor of his who had worked for Berquist when Gorman was a child. When the district attorney asked Berquist if he could give the State a fair trial based on what he knew about Gorman, Berquist responded:
BERQUIST: Well, on one witness?
DA: No, there'll be several witnesses.
BERQUIST: Yeah, I mean, I might throw out his testimony.
DA: Okay. Would you throw out his testimony just because of what you know about him in the past or would you be willing to listen to him up here and decide based upon his demeanor and how he acts and whether his testimony is corroborated by others' testimony, would you base it on what you hear today or would you base it on what you know about him?
BERQUIST: Well, I've known him for a long time. That's hard to say.
DA: Okay. I appreciate your honesty. I'm going to assume that what you've said (sic) if you don't think you can judge his credibility and be fair.
BERQUIST: That's true.
DA: Let me ask you one more thing. What if Michael Gorman's testimony didn't bear on the key issue at trial, if it was just one of the facts leading up to the trial? Would you disregard what he said? Are you telling me you're going to disregard what he says?
BERQUIST: Well, I hate to say it that way but probably.
The district attorney also questioned the prospective jurors regarding the degree of proof required for a conviction and explained that there is no possible way she could prove this case beyond all doubt:
DA: ... Mr. Berquist, do you agree that a case has to be proven beyond all doubt?
BERQUIST: No, ma'am.
DA: Do you see the difference in why I could not prove to you beyond all doubt?
BERQUIST: Yes, ma'am.
The district attorney later asked all the prospective jurors if they had a reason why they cannot serve:
DA: Mr. Berquist, besides what we've been through?
BERQUIST: No, I do not.
During further voir dire examination by the district attorney, Berquist stated that he had no problems with the legal system, plea bargains or testimony from someone who had made a plea bargain and then testified for the State.
*859 Defense counsel began her voir dire by asking the prospective jurors to tell something about themselves:
BERQUIST: Okay, I'm Wally Berquist. I'm 39 plus. Thank God I've got a forgiving God and forgiving children. I've been married, divorced and recently remarried. Job relocation. I used to be a horse trainer for 25 years. Now I'm a nurse. I love boating.
Also, although Berquist related that he had been a crime victim years ago and had a relative who was in jail, neither fact would cause him to be biased toward the State or the defense. Defense counsel asked Berquist if he had heard anything about the case and Berquist responded that he had read about the case in the newspaper a long time ago and again this past weekend. When defense counsel asked Berquist if he had formed any type of opinion, Berquist answered:
BERQUIST: Not really.
DEFENSE COUNSEL: Okay. Do you feel like that because you have read something about the case in the paper that that (sic) would cause you maybe not to be quite as fair and impartial as you would had you not read that in the paper?
BERQUIST: Well, I mean, to be truthful, it does make you a little biased but, you know, you try to listen to the stuff that's presented to you and, you know, try to weigh the pros and the cons.
When asked by defense counsel whether he thought he would make a good juror, Berquist responded:
BERQUIST: Well, if I was sitting up there in that same spot, I'd want my peers to be judging me, and I'd want them to, you know, be the same, you know, don't be judgmental.
DEFENSE COUNSEL: Do you think you'd be able to listen to all of the evidence in making your determination?
BERQUIST: Yes, ma'am.
Defense counsel asked Berquist if he had children, and whether he ever had to determine whether his children were telling the truth. Berquist replied affirmatively, and stated that he could determine whether they were telling the truth by body language and other factors. The questioning continued:
DEFENSE COUNSEL: Do you think that when you're listening to the testimony that you'll be able to take into account any motives or anything like that when you're listening to the witness's testifying?
BERQUIST: Yes, ma'am.

* * *
DEFENSE COUNSEL: Do you think it's better to lock up an innocent man or to let a guilty man go free?
BERQUIST: Well, this is about going to a gut feeling, whatever I feel my gut tells me, that's the way I'm going to go, you know. I don't want a guilty man out on the street but I sure don't want an innocent man in jail, either.
Berquist asked defense counsel several questions regarding her previously related definition of manslaughter. He also stated that it would appear that, if the defense had done its "homework," it would have something to present to show why the defendant is innocent. Defense counsel told Berquist that much of the defense's information could be brought out on cross-examination of the state's witnesses. Berquist indicated that he understood.
*860 Later during the voir dire examination, Berquist asked another question of defense counsel:
BERQUIST: The last thing he brought up that probably would weigh heavy on my mindsay this is not a cut and dry case and the defendant's life hinges on everything that was brought up, and it's a sway right here, it could go either way, if he didn't get up and testify, I think it could sway me.
DEFENSE COUNSEL: Okay.
BERQUIST: You know, if it's a very close case.
DEFENSE COUNSEL: Okay. So you think you might holdyou would hold it against
BERQUIST: I think I could. I mean, he'd be the one to be able, you know, probably sway me one way or the other, you know. So
DEFENSE COUNSEL: Okay. I appreciate your honesty with that. Does anybody elsedid anybody else think of anything? Thank y'all.
After a sidebar conference, the district attorney and defense counsel exercised their peremptory challenges. Defense counsel challenged Berquist for cause, noting that he said he would have trouble if the defendant did not take the stand in a close case and would, therefore, have trouble following the law. Other reasons advanced in support of the challenge were that Berquist was biased because of media coverage and he knew one of the witnesses and, therefore, he may have already formed an opinion. The trial court permitted follow-up questions by both sides. Berquist clarified that his reading of a recent newspaper article about the case would not cause him to be less fair and impartial. Questioning by defense counsel regarding a defendant's right not to testify followed:
DEFENSE COUNSEL: The other issue I need to ask you about is I think when I was about to sit down you said you had something to add, that in a close case that if Mr. Sales did not take the stand that you might hold it against him. Could you elaborate a little bit on that?
BERQUIST: Well, I mean, if this is not a cut and dry case and it's very close and his life is hanging in the balance, I'd expect him to get up and say something on his behalf.
DEFENSE COUNSEL: If Judge Stinson instructs you that you're not to hold that against Mr. Sales, that he has a fifth amendment right not to testify, do you think that you would be able to follow the law?
BERQUIST: I don't you know, I'm a Christian and I don't judge people and I hope I don't, you know, in those aspects but, you know, in the back of your mind you're always wondering why didn't he get up and testify on his own behalf. And that's the only thing thatyou know, that's why I came out and brought it up.
DEFENSE COUNSEL: Okay, Like I say, we're not trying to
BERQUIST: Yes, ma'am, I understand.
DEFENSE COUNSEL: So even with the judge's instructions, it still may cause you to hold it against Mr. Sales at that point in time?
BERQUIST: I'mI pray to God that I don't do it that way, you know.

* * *
BERQUIST: I just look at it like if I was in that position and it was a close case, I'd definitely want to get up and testify on my behalf. And I guess that's the way I'm looking at it, you know. I'm trying to put myself in his shoes like what if, you know. And I *861 understand pleading the fifth, I understand that. But to me if my life's in jeopardy, I'd definitely want to be up there, you know, showing my point of view.
DEFENSE COUNSEL: Okay. Sitting as a juror, not being in Mr. Sales shoes but sitting as a juror, do you think that you would hold it against him? And there's no right or wrong answer, Mr. Berquist.
BERQUIST: I know. I mean, I'm brought up a Christian and all that, but my gut feeling's telling me something isn't right if he doesn't get up and testify if it's a close case.
During questioning by the district attorney, Berquist reiterated that he would base his verdict solely on the evidence and would be able to set aside any opinion he may have formed after reading the newspaper article. The district attorney then went into Berquist's problem with a defendant's failure to testify in a close case. She explained that there is a multitude of reasons why a defendant might not testify and gave the example of persons who stutter and persons who are very nervous and cannot handle talking to people and making eye contact. The questioning ended with the following colloquy:
DA: ... But all I'm asking is can you follow the law and when the judge instructs you (sic) you are not to use that against him in making your decision, will you do that?
BERQUIST: Okay. I can do that.
DA: Thank you.
BERQUIST: I understand it now.
DA: Thanks.
Defense counsel reurged its challenge for cause, which was denied by the trial court. The record confirms that Defendant used all of his peremptory challenges. Defendant now argues that a thorough review of the voir dire of Berquist reveals an inability to be fair and impartial. He urges that Berquist's candid responses, taken as a whole, reveal facts from which bias, prejudice or inability to render judgment accordingly may be reasonably implied. He contends that Berquist's inclination to insist that a defendant take the stand raises the question of Berquist's ability to be fair and impartial.
The State argues that Berquist was "rehabilitated" by subsequent voir dire, which clearly indicated his ability to follow the law as given by the court. Noting that the trial court was satisfied that Berquist could render an impartial verdict according to the law and evidence, the State urges that such action was not an abuse of discretion. We agree.
When a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Maxie, 93-2158 (La.4/10/95); 653 So.2d 526; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278; State v. McIntyre, 365 So.2d 1348 (La.1978). In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he must show the following: (1) erroneous denial of a challenge for cause; and (2) use of all his peremptory challenges. State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651, and cases cited therein. See also State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320, cert. denied, 520 U.S. 1182, 117 S.Ct. 1461, 137 L.Ed.2d 564 (1997); State v. Lee, 559 So.2d 1310 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); State v. Richardson, 33,272 (La.App.2d Cir.11/1/00), 779 So.2d 771, writ denied, 00-3295 (La.10/26/01), 799 So.2d 1151.
*862 La. C. Cr. P. art. 797 provides, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * *
(4) The juror will not accept the law as given to him by the court.
A trial court is vested with broad discretion in ruling on challenges for cause, and its ruling will be reversed only when a review of the entire voir dire reveals that the court abused its discretion. State v. Richardson, supra; State v. Ellis, supra, citing State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. Also see: State v. Brown, 496 So.2d 261 (La.1986); State v. Walker, 577 So.2d 770 (La.App. 2d Cir.1991), writ denied, 581 So.2d 704 (La.1991); State v. Jackson, 548 So.2d 57 (La.App. 3d Cir.1989).
A refusal by a trial judge to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Cross, supra; State v. Welcome, 458 So.2d 1235 (La. 1983), cert denied, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 152 (1985); State v. Richardson, supra; State v. Ellis, supra.
As Chief Justice Calogero stated in State v. Lee, supra:
When a juror expresses a predisposition as to the outcome of a trial [or in this case, as to a particular sentence], a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct", isolated answers, or, for that matter, "incorrect", isolated answers. (Citations omitted.) State v. Richardson, supra.

Although Defendant used all of his peremptory challenges, a review of the entire voir dire of prospective juror Berquist supports the trial court's ruling on the defense's challenge for cause. See State v. Richardson, supra; State v. Ellis, supra, and cases cited therein. First, regarding the issue of Berquist's prior association or relationship with State witness Gorman, we find that any error in not excusing Berquist for cause on this ground was harmless. Gorman was not the State's primary witness and the elements of the offense of second degree murder were established through various witnesses other than Gorman. Second, with respect to Berquist's expressed opinions on a defendant's decision not to testify in his own behalf, we find no constitutional error. After defense counsel's objection for cause to Berquist, the trial court allowed both defense counsel and the district attorney to ask follow-up questions of Berquist. The district attorney's "rehabilitation" of Berquist evidenced his eventual understanding of Fifth Amendment concepts *863 and his willingness to apply the law. Specifically, after the district attorney gave Berquist several examples of legitimate reasons why a defendant might not testify on his own behalf, Berquist responded that he "now" understood and could follow the law and the judge's instructions regarding a defendant's right not to testify. Third, Berquist clarified that his reading of a recent newspaper article about the case would not cause him to be less fair and impartial. Thus, Berquist demonstrated a willingness and ability to decide the case impartially, according to the law and the evidence. We, therefore, find no reversible error in the trial court's denial of the defense counsel's challenge for cause to Berquist. This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the conviction of Defendant, Christopher Van Sales, is affirmed.
AFFIRMED.
NOTES
[1] Gorman admitted at trial that the documents did not contain the victim's name.
[2] In exchange for his testimony, Waters was allowed to plead down to Accessory After the Fact.