STEWART, J.
|¶ The defendant, William H. Painich, appeals his conviction for the second degree murder of Wanda Dale Goettig. Finding no merit to his assigned error of insufficiency of the evidence, we affirm.
*1119 FACTS
Painich was charged by bill of indictment with second degree murder, a violation of La. R.S. 14:30.1, and with unauthorized use of a movable, a violation of La. R.S. 14:68.4, both stemming from events that occurred between December 10 and December 12, 2006, in Monroe, Louisiana. A jury found Painich guilty as charged on both counts. This appeal concerns only the sufficiency of the evidence in support of the second degree murder conviction for which he received a life sentence. We will review the evidence presented at trial to determine whether, when viewed in the light most favorable to the prosecution, it was sufficient to convince a rational trier of fact that all the elements of second degree murder had been proven beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
TRIAL TESTIMONY and EVIDENCE
Rita Townsend testified that she spoke almost daily to Goettig, who was her twin sister, and that they last spoke around 10:30 p.m. on Sunday, December 10, 2006, after the victory of the New Orleans Saints over the Dallas Cowboys. Townsend called Goettig several times the next day but got no answer. When she still could not reach Goettig on the morning of Tuesday, December 12, 2006, Townsend went to her apartment where she saw Goettig’s car, a gray Ford Taurus, in the parking lot but not in its usual Rspot. Townsend knocked on Goettig’s door and called out her name. She could hear a television playing inside, but no one responded.
Townsend asked the maintenance supervisor, Michael Young, to open the door of Goettig’s apartment. Young unlocked the door with a master key, but a safety chain was hooked on the inside. They then knocked on a window at the rear Goettig’s apartment, but no one answered. Townsend noticed two bags on the grass behind the apartment. She described them as a red “Marlboro” bag and a “bag like you might roll.” One bag had a tag with the name “Bearl Wheeler,” who was later identified as Painieh’s “adoptive father.” Young corroborated Townsend’s testimony and stated that he advised her to call the police. Townsend testified that when she returned to her car in the parking lot, Goettig’s car was gone.
While Townsend and Young were behind the apartment, James Lynn Owens called out to them. Owens lived in an apartment complex located behind Goettig’s apartment and her bedroom window overlooked Goettig’s rear patio area. Owens testified that when she opened her bedroom blinds that morning, as was her daily routine, she noticed a white, heavyset male with a big, black tattoo on his right arm. (This description fits the defendant.) Because he seemed to be “doing strange things,” she paid attention to him. She described him as pacing back and forth and looking around. She saw him throw luggage and “scrub shoes” over the fence. Crime scene photos introduced into evidence show a red bag and a smaller blue bag behind a wooden privacy fence at the rear of Goettig’s apartment | .¡and a pair of blue shoes in the grass behind a chainlink fence between the two complexes.
Owens further testified that the man was “ducking down, like ducking low” as he left the apartment through the privacy fence gate and looking about as though trying to see if anyone was around. She said that he ran to the parking lot, returned to the apartment, and again ran to the parking lot a few minutes later. Shortly after, Owens saw Townsend knocking on the rear window of Goettig’s apartment and called out to tell her that a man had just left the apartment. Owens could not conclusively identify the defen *1120 dant as the man she saw behind the apartment.
Corporal Tommy Crowson and Officer Joe Stewart of the Monroe Police Department arrived to check Goettig’s apartment. Crowson testified that upon entering the rear patio area, which was surrounded by a privacy fence, they saw that the sliding glass door was open and could hear a television playing at a high volume. While searching the apartment, they found Goet-tig on the floor of the second bedroom. Her body was covered with a bedspread. Crowson checked for vital signs and found none. They completed their search and then secured the apartment as a crime scene.
Detective James R. Willis testified that while he and other officers were looking for Goettig’s car, he noticed a car matching the description of the Ford Taurus parked in a vacant field near a canal and positioned so that the license plate could not be seen. The trunk and doors were open, and the defendant was standing outside the car. Willis along with two other detectives approached Painich and took him into custody by handcuffing |4him and reading him his rights. Willis described Painich as being steady, coherent, and not appearing to be under the influence of drugs or alcohol. Among items removed from Painich’s pockets was a photograph of some children. When Willis asked if the children in the photograph were his, Painich began crying and stated that it didn’t matter anymore, that he had done something bad, and that he was going to prison.[1] When asked what he had done, Painich did not elaborate. Willis transported him for questioning.
At the police station, Detective Quinton Holmes Mirandized and then interviewed Painich. Their conversation was videotaped, and the tape was deemed admissible following a free and voluntary hearing outside the jury’s presence. The video was then played for the jury.
Painich stated that he met Goettig, who had been friends with his father and recognized him as “Jinx’s son,” on Monday, December 4, 2006, at O’Banion’s Pool Hall. He had recently left a rehab facility. Pai-nich drove her to a pool tournament that night, and she agreed to let him stay with her for $30 a day. He claimed that he gave her money about three times and that Goettig did not want anyone to know he was staying with her because it was a government apartment. Painich said that they had a “mother and son” relationship. He claimed that she let him use her car, that she sent him to the ATM for money at least 10 times, and that she let him do drugs and did some with him.
| ¡Painich stated that he slept all day Sunday, December 10, 2006, and then watched the football game with Goettig, whose sister called during the game. After the game, Painich used Goettig’s car to get money and crack. He stated that he went to several ATMs and withdrew between $100 and $200 from her account. He then drove to Lilac Street where he bought $100 of crack from “several different ones.” Next, he claimed that he and Goettig smoked eight rocks of crack in about an hour. Initially, Painich stated that he brought two people to the apartment after the game to smoke crack, but he also claimed that he and Goettig smoked crack with “Gavin” at the kitchen table of his apartment. Sometime late Sunday night, Painich left Goettig’s apart *1121 ment. He said Goettig was on the couch when he left.
Painich next recalled returning to Goet-tig’s apartment around 1:00 a.m. on Tuesday morning with Amanda Parker, a woman he met at “Twins’ house.” He claimed that Parker called three guys to come to the apartment and that she bought crack from them. Painich said that he and Parker did drugs, had sex, and watched television. Painich stated that he told Parker to be quiet so as not to awaken Goettig, whom they did not see while at the apartment. Painich said that Goettig was a “hard sleeper” due to medications she took. Painich and Amanda left the apartment sometime before daylight and at some point got “split up.” He mentioned that Goettig’s wallet had been in her car and that Parker had gotten one of Goet-tig’s ATM cards and he had the other one.
Painich testified that he returned to Goettig’s apartment around 3:30 a.m., entering through the unlocked sliding glass door. He did not have a |fikey to the apartment. Painich stated that he used the bathroom; ate cheese, crackers, and soup; drank some milk; tripped over the coffee table and knocked some candle wax onto the floor; and then knocked on Goet-tig’s bedroom door around 5:00 or 5:30 a.m. He opened the door, found Goettig dead on the floor, and covered her with a blanket from the bed. Painich said that he vomited in the doorway and did not clean it. Painich claimed that he was high and paranoid due to smoking crack for days and that he had never before found a dead body. So, he panicked and began throwing his clothes into the Marlboro bag and a blue bag. He then heard someone banging on the door. Looking through the peephole, he saw a woman. Instead of answering the door, Painich threw his bags and shoes over the fence behind the apartment. He intended to retrieve his belongings, but a locked gate prevented him from getting to them, and he could not squeeze through or get over the fence. He then left in Goettig’s car.
Painich admitted that he pawned some rings and silver dollar coins.[2] He claimed not to know whom the rings belonged to, but indicated that they were in a camouflage billfold in Goettig’s car. He said that the coins were his, but he admitted that Goettig kept coins on top of her refrigerator. Finally, he said that he last visited the ATM sometime Monday morning.
Amanda Parker testified that she saw Painich at the home of Terius Jenkins and that Painich asked if she wanted to see his apartment. She left with him in a car which he said was his. They made two stops at banks for Painich to get money using an ATM card. They entered the apartment [7through a sliding glass door. Painich told her that he had a woman roommate, but Parker did not see anyone at the apartment. Painich showed her some but not all the rooms, he let her pick out some clothes to wear, and she used some makeup left in the bathroom. Parker testified that Painich left her alone in the apartment for about an hour. She said that before leaving, Painich went to the back bedroom of the apartment and that she heard him say something. While alone, she watched television and did not look in any of the rooms. He returned with some crack. Parker stated that Pai-nich also gave her two Somas and told her that she could take some Valium from a bottle on top of the refrigerator. She took four or five of the pills. Parker explained that she has a “high tolerance for drugs.” Parker also testified that she sprayed *1122 some “409” cleaner on a spot that looked like blood near the small couch. Painich told her it was from his kid. Parker stated that she was at the apartment until about 4:30 a.m., that Painich dropped her off in West Monroe, and that she fell asleep at an abandoned house. In the morning, she tried to use a bank card that belonged to Goettig to get some food, but it did not work. She was not sure how she came to have the card. Parker left a white “hoodie” at the apartment. When she returned to get it, she saw police cars and yellow tape. She asked the police about the hoodie when they picked her up for questioning and claims the police told her it was full of blood.
Detective Holmes testified about the investigation. He noted the inconsistency between Painich’s claim that three men came to the apartment while he and Parker were there and Parker’s claim that she and Painich were |salone at the apartment. He also noted that Painich’s claim that he tried to climb over the fence to retrieve his bags was inconsistent with what Ms. Owens reported seeing him do. Detective Holmes said that Parker’s hoodie, which appeared to have blood on it, was found next to the sliding glass door and sent to the crime lab for testing. Drug paraphernalia used for smoking crack was found on the kitchen table. Crackers and a milk carton were found in the trash can and a soup can was in the kitchen. A used condom was also found in the trash can. A piece of cord, which the police believed was used to strangle Goettig, was found next to her and sent to the crime lab. The cord appeared to be broken, but the other piece was not found. However, the police recovered a hotplate in one of Painich’s bags and believed that the cord came from it. Detective Holmes testified that Luminol, which is used to detect areas of blood, was sprayed in the apartment almost two months into the investigation. He said that the Luminol glowed from a spot in the living room, down the center of the hallway, and into the bedroom where Goettig was found. A cutting of the carpet with red spots on it was sent to the crime lab, but did not test positive for blood.
Detective Holmes testified that Goettig’s bank and credit card records showed numerous transactions on December 11, 2006. Goettig’s AmSouth account records showed one checkcard purchase and over 10 withdrawals totaling over $700 made at ATMs at seven different locations. Her Washington Mutual credit card records showed four cash advances totaling over $450.
|Finally, Detective Holmes testified that he interviewed James Collins, Goettig’s ex-boyfriend, and that his alibi checked out. He further testified that there was no reason to suspect Collins, and there was no indication that Amanda Parker was involved in Goettig’s murder. All the evidence pointed to Painich.
James Collins testified that he had a 12-year relationship with Goettig that ended in a domestic altercation in May 2006. He described their relationship as “stormy.” He testified that he had seen her a few times after their breakup and did things for her. He last saw her at O’Banion’s Pool Hall on December 7, 2006, at which time she introduced him to Painich. Collins testified that he was not upset about seeing her with someone else, and he stated that he did not kill her.
Dr. Patrick Wojtkiewicz, the DNA unit supervisor at the North Louisiana Crime Lab, qualified as an expert in forensic biology and forensic DNA and testified about the evidence submitted for testing. Neither Parker’s white “hoodie” nor the piece of carpet from Goettig’s apartment tested positive for blood. The piece of cord found by Goettig was submitted to *1123 two types of DNA tests. The first was the basic DNA test which uses PCR, or polymerase chain reaction, to amplify the DNA found on a item. Wojtkiewicz explained DNA from two people will show up on the PCR test if both contributed DNA in equal amounts, but the PCR test will not show a second contributor of DNA if the first person’s DNA makes up 20 times or more of the DNA on the item. The majority of the DNA on the cord was Goettig’s, which was consistent with the theory that the cord was used to |10strangle her. The PCR test excluded Painich as a donor of DNA on the cord.
The second test was the YSTR test, which is used to identify certain DNA found only in males. The YSTR test works well to “fish out” the male DNA when there is a mixture of male and female DNA. The lab obtained a YSTR profile from the cord. Wojtkiewicz explained that all males in the same paternal linkage, such as fathers, male children, and brothers, would have the same YSTR profile. Thus, the profile was consistent with being from more than one male. Painich’s DNA profile had enough of the same characteristics as the YSTR profile that he could not be excluded as the donor. However, Wo-jtkiewicz conceded that Painich also could not be conclusively identified as the donor. Moreover, there was nothing to indicate when the DNA would have been left on the cord.
Dr. Frank Peretti, an expert in forensic pathology, performed the autopsy on Goet-tig. Dr. Peretti determined the cause of death to be ligature strangulation. Goet-tig also suffered from blunt force head injury as indicated by multiple facial abrasions, a black eye, and internal bruising in areas on the left side of her head. These injuries were consistent with being punched or slapped. Dr. Peretti categorized bruising on Goettig’s arms as defensive injuries indicating she had been involved in a struggle. Dr. Peretti noted that scrapes present on Goettig’s knees likely happened perimortem (about or near the time of death) or postmortem and were consistent with her falling to the ground, He also found that she had cirrhosis of the liver, which did not contribute to her death. The toxicology report revealed hnumerous drugs in Goettig’s system, but no illicit drugs or alcohol. No cocaine or cocaine metabolites were found.
The defense called three witnesses. Bearl Wheeler, identified as Painich’s “adoptive father,” testified that Painich collected coins and that Painich had told him about staying with Goettig. Vicky Johnston testified that she had seen Goet-tig and Painich at O’Banion’s Pool Hall about a week before her death. She also knew James Collins and believed he was Goettig’s husband. She saw Collins at a “wake” held for Goettig at O’Banion’s and described him as having a good time. Becky Griggs testified that she called the police with information that Amanda Parker had a credit card belonging to Goettig. Detective Holmes was recalled and testified that he spoke to Griggs but already knew about Parker having the card.
APPLICABLE LAW AND ANALYSIS
When examining the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. See also La. C.Cr. P. art. 821. The appellate court does not substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), *1124 922 So.2d 517. We neither assess the credibility of witnesses nor reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. The Injury’s decision to accept or reject the testimony of a witness in whole or in part is given great deference. State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard applies in cases involving both direct and circumstantial evidence. Conflict in the direct evidence is resolved by viewing it in the light most favorable to the prosecution. The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a credibility determination, the matter is one of the weight of the evidence, not its sufficiency. Id. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. It is also the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Mims, 39,757 (La.App.2d Cir.6/29/05), 907 So.2d 237. When a conviction is based on circumstantial evidence, such evidence must exclude any reasonable hypothesis of innocence. La. R.S. 15:438. Whether circumstantial evidence excludes every reasonable hypothesis of innocence is a question of law. State v. Van Sales, 38,138 (La.App.2d Cir.3/3/04), 867 So.2d 849, writ denied, 2004-1305 (La.4/22/05), 899 So.2d 569.
Second degree murder is the killing of a human being where the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is a state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10.1. It may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Wiggins, 44,616 (La.App.2d Cir.9/23/09), 22 So.3d 1039, writ denied, 2009-2329 (La.4/23/10), 34 So.3d 271. A jury may consider flight and attempts to avoid apprehension as evidence of a guilty conscience. Id.
The blunt force head injury and sti'angulation indicate a specific intent to kill. The issue is whether Painich was the perpetrator.
Painich argues that, with the exception of his ambiguous post-arrest statement that he had done something bad and was going to prison, this is a largely circumstantial case. He further argues that the circumstantial evidence did not exclude other possible suspects.
JjjThe state counters that there was strong direct and circumstantial evidence supporting the conviction and that the evidence at trial clearly established that Pai-nich was the person who murdered Goet-tig.
Having closely considered the evidence presented by the state in light of the Jackson standard, we find no merit to Painich’s *1125 argument that the evidence was insufficient to convict. The evidence placed Pai-nich in Goettig’s apartment near the time of her death. In his statement to the police, Painich claimed that he left the apartment sometime late Sunday night, December 10, 2006, after watching a football game with Goettig and then doing drugs. Contrary to Painich’s claim that Goettig smoked crack with him, the toxicology report on Goettig was negative for illicit drugs, cocaine, or cocaine metabolites.
We note that Painich claimed to have been doing drugs for days and to still be high even at the time of his taped interview. However, he appeared alert and coherent. He understood the questions and formulated detailed answers regarding his actions and whereabouts except from the time he stated that he left the apartment Sunday night until he returned there with Parker Monday night or the early hours of Tuesday morning.
Parker’s testimony established that Pai-nich told her that both the car he was driving and the apartment were his, and he let her pick out clothes from the apartment to wear. However, he did not let her see all the rooms in the apartment. Both Parker’s testimony and Painich’s statement established that Parker did not see Goettig while at the apartment. Parker also contradicted Painich’s claim that three men came to the apartment while fythey were there. Even though Parker admitted that she tried to use a card belonging to Goettig to buy food the next morning, the police found no evidence indicating her involvement in Goettig’s murder. In fact, Painich’s statement indicated that Parker got the card out of Goettig’s car. The jury could have reasonably discounted the possibility that Parker or any of the three men alleged by Painich to have visited the apartment murdered Goettig. Additionally, the police questioned Goettig’s former boyfriend, James Collins, and found no connection between him and the murder.
Direct evidence placed Painich at Goet-tig’s apartment almost immediately before her body was found. Owens observed a man throw his bags and shoes over the privacy fence behind the apartment. She testified that he was acting strangely and ducking as if attempting to avoid detection while running to the parking lot. Though Owens could not positively identify Pai-nich, his own statement indicated that he was the man Owens saw and that he was attempting to flee the apartment and avoid detection by the woman, apparently Townsend, who began knocking on the door. Furthermore, Townsend testified that Goettig’s car was in the parking lot, but not in its usual spot, when she arrived, but that it was gone by the time she returned to her car. This coincides with Painich fleeing the apartment.
Painich was found with Goettig’s car and a bank card in his possession. Goettig’s bank and credit card records showed that over 10 withdrawals totaling over $750 were made from her account on December 11, 2006, after the presumed time of her death, and over $450 in cash advances were made on her credit card. Painich’s statement to Officer | mWiIlis that he had done something bad and was going to prison is indicative of his culpability for Goet-tig’s murder. Considering the facts that Painich was found with Goettig’s car, bank card, and other items in his possession, the jury reasonably chose to believe that the statement referred to the murder and not to an admission of drug use. Finally, when the piece of cord found next to Goet-tig was tested specifically for male DNA, Painich could not be excluded as a donor to the DNA profile.
A rational jury considering all the facts established by direct and circumstantial evidence could reasonably conclude that Painich murdered Goettig and then used *1126 her bank card to get money and do drugs until the morning of Tuesday, December 12, 2006, when Goettig’s sister came to the apartment to look for her. At that point, Painich hurriedly removed his belongings from the apartment and fled so as to avoid detection. The defendant offered no reasonable hypothesis of innocence. The jury could have reasonably disbelieved Painich’s claim that three men came to the apartment and believed Parker’s testimony that she was alone at the apartment with Pai-nich. Furthermore, there was no evidence to support the defense’s effort to point to James Collins as the murderer. While none of the facts standing alone would suffice to prove the state’s case, the evidence considered in the light most favorable to the prosecution suffices to prove beyond a reasonable doubt that Painich committed the second degree murder of Goettig.
1,.CONCLUSION
For the reasons stated, we affirm the defendant’s conviction for second degree murder and life sentence.
AFFIRMED.

. A free and voluntary hearing was conducted outside the presence of the jury to determine whether the defendant's statement to Det. Willis would be admitted. The trial judge found it admissible.

. The pawn ticket describes the pawned items as, "Ring Jewelry, 10 KT, 4.70 DWT, 3 Ladies 10k Gold Rings 2 White Gold and 1 Yellow Gold [with] 4 Silver.”