888 So.2d 982 (2004)
STATE of Louisiana, Appellee
v.
Rodney L. DOUGLAS, Appellant.
No. 39,036-KA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 2004.
*986 Louisiana Appellate Project by Kenota Pulliam Johnson, for Appellant.
Paul Joseph Carmouche, District Attorney, J. Thomas Butler, Assistant District Attorney, Lea R. Hall, Assistant District Attorney, for Appellee.
Before WILLIAMS, CARAWAY and LOLLEY, JJ.
LOLLEY, J.
This criminal appeal by Rodney L. Douglas ("Douglas") arises from the First Judicial District Court, Parish of Caddo, Louisiana. Douglas was tried by a judge and convicted as charged of aggravated burglary, sexual battery, and attempted second degree murder. He was found to be a third felony habitual offender, and sentenced as such to serve 100 years imprisonment at hard labor for attempted second degree murder. Douglas was also sentenced to serve 30 years imprisonment at hard labor for aggravated burglary, and 10 years imprisonment at hard labor for sexual battery. All sentences were ordered to run concurrently, and the sentences for sexual battery and attempted second degree murder were imposed without benefit of probation, parole or suspension of sentence. For the following reasons, Douglas' convictions and sentences are affirmed.

FACTS
Douglas was charged by bill of information with aggravated burglary, sexual battery and attempted second degree murder. He apparently eluded capture by the authorities for approximately a year following the crimes. The evidence presented at his trial is summarized as follows:
Late in the afternoon on June 26, 2001, Isaac Merritt ("Merritt") was at his Shreveport home, preparing to drive his mother-in-law to Pennsylvania. Merritt's mother-in-law was in town to help the Merritt family with their recent move to Shreveport. Merritt's friend, Joseph Watkins ("Watkins"), was accompanying Merritt on the trip. Watkins had been staying with Merritt, Merritt's wife, L.T., the victim herein, and their two children, J.M. and F.M., since the move.[1]
In preparation for the trip, Merritt was working on his vehicle in front of his garage when a red Chevrolet Blazer (the "Blazer") pulled up in his driveway. The occupants, who were later identified as Douglas and his cousin, B.J. Moton ("Moton"), exited their vehicle. Douglas was an acquaintance of Watkins'. The four men conversed for a while. Douglas and Moton then left in the Blazer. At about 9:00 or 10:00 that evening, Merritt, Watkins and Merritt's mother-in-law left on their trip to Pennsylvania.
Merritt testified at trial that both J.M. and F.M. came outside at some point during Douglas' afternoon visit, and both of them saw Douglas, whom F.M. knew as "Rodney." Merritt and his children knew *987 Douglas because he and Watkins "hung around." Merritt identified a photograph of a red Chevrolet Blazer as being the same vehicle he saw Douglas arrive in at his house on the aforementioned afternoon.
L.T. testified that her husband, her mother and Watkins left for Pennsylvania sometime after sunset, and she was left home alone with the two children. That same night, at approximately 11:20, L.T. put F.M. to bed and prepared to watch television. J.M. was already in bed in his room. The doorbell rang and F.M. jumped out of bed and ran to the door. L.T. cautioned F.M. not to open the door, and she then walked to the door and asked, "Who is it?" The person responded, "Joe" (Watkins' first name) through the door, so she only partially opened the door. At that time, she only saw one person, whom she identified in court as Douglas-she had never seen Douglas before that night. Douglas was holding a book bag and said he had something for Watkins. L.T. told Douglas that Watkins was not there, and then he asked to use her bathroom, to which, L.T. replied, "No" and tried to close the door. At that point, Douglas blocked the door open with his arms and began wielding a knife. He threatened to cut L.T.'s face if she did not open the door. F.M. was standing at the doorway with L.T. When L.T. pushed F.M. behind her to safety, Douglas forced his way into the home and flagged another man to follow him inside, whom L.T. did not recognize. Although the only light on in the house at the time was the ceiling light located in the middle of the hallway, L.T. got a good look at Douglas as he came through her front door.
After he entered, Douglas asked L.T. if she had a gun, and she answered, "No." He then asked L.T. if she had any money, and she again said, "No." While the other man was trying to move the stereo, Douglas grabbed L.T.'s throat with his hands, moved her across the living room toward the fireplace and made her get down onto the floor. Douglas repeatedly threatened L.T. that if she failed to cooperate, the other man would either choke or cut her kids. L.T. was lying on her back, and Douglas ordered her to open her robe and remove her underwear. L.T. screamed while Douglas, who was between her legs, inserted his fingers into her vagina without her consent.
The other man came and told Douglas, "Come on, man." The man had something underneath his arm wrapped in one of her bath towels as he left the house. However, Douglas stayed and began stabbing L.T. repeatedly with a knife in her upper left breast area. L.T. managed to wrestle the knife away from Douglas and rolled over onto her stomach. She tried to throw the knife out of Douglas' reach; however, he retrieved the knife and began stabbing L.T. in the back. L.T. stopped fighting Douglas, and he finally exited the house through the front door. She managed to close the door, get the telephone, and call 911 for help.
Paramedics treated L.T. at the scene and transported her to the hospital. During her extended hospital stay, she was given a blood transfusion because of her blood loss and was treated for a collapsed lung. While L.T. was still in the hospital and on pain medication, she was awakened and shown two photographic lineups by the police. L.T. "tentatively" identified the person in picture number five in the first lineup (Douglas) as the person who stabbed her, and she also tentatively identified a person in the second lineup as the other man who entered the house. However, later L.T. had no doubt regarding her in-court identification of Douglas as her assailant.
*988 L.T.'s son, J.M., who was 11 years old at the time of trial, made an in-court identification of Douglas as the person he saw stabbing his mother. He testified that on the night of the crime, his sister came into his room and told him someone was hurting their mother. J.M. walked into the living room and saw Douglas on top of his mother, stabbing her as she tried to fight him off. J.M. stated he got "a look" at Douglas, who wore a plaid shirt and blue jeans, which J.M. stated were down. From where J.M. stood, it looked like Douglas was raping his mother. Then the other man put J.M. in a headlock and took him back into his bedroom. F.M., who had been standing by J.M., went with them. J.M. testified that the man who stabbed his mother had been over at his house earlier in the day. During the subsequent investigation, both J.M. and F.M. told the police that the assailant's name was "Rodney." J.M. later identified the person in picture number five in a photographic lineup (Douglas) as the person who stabbed his mother.[2]
Tiffany Word (formerly known as Tiffany Johnson) testified that she loaned her Blazer to Douglas on the day of the crime. When Douglas and his cousin Timmy Terrell Terry ("Terry") came back to her house later that night, Douglas appeared upset and Terry seemed nervous. Terry kept saying Douglas was "wild" and kept saying, "I can't believe this." Terry brought in a VCR, which was wrapped in a towel. Douglas said he cut his finger and asked Tiffany to wash his shirt, which she did. Tiffany let Douglas borrow her Blazer again later that night. Terry took the VCR and towel with him. These items were later found in the back of her Blazer. Tiffany was subsequently called by the police to tell her the Blazer had been impounded.
Terry, Douglas' accomplice, also testified at trial. He entered a guilty plea to aggravated burglary as a second felony offender and agreed to testify at Douglas' trial, but had not been sentenced at the time of the trial.[3] Terry made an in-court identification of Douglas. He testified that he encountered Douglas and Moton earlier on the evening of the crime, and Douglas had told him about a fifteen-thousand dollar "lick." Terry explained that a "lick" is a "hustle," or a way to make money that is usually illegal. Terry and Moton rode around with Douglas in the Blazer that night, and they bought and used some cocaine. After about an hour of riding around, they stopped at L.T.'s home. Douglas told Terry that he had to drop a backpack off to Joe. Douglas went inside, Terry heard a woman scream, and then Douglas called for Terry to come in. Moton acted as the "look-out."
When Terry entered the house, he saw Douglas choking a woman. He heard the woman screaming about her "babies" so he went to find the children. Terry looked for but never found the $15,000.00 Douglas had told him about. Terry took a VCR and about a hundred dollars from a piggy bank, as he heard the kids screaming for Douglas to get off their mother. Douglas told Terry to get the kids and "choke them out" or kill them if the victim did not shut up. Terry then carried the little boy back to his room. Terry saw that Douglas had his pants down and L.T. appeared to be *989 naked. Terry ran outside to speak to Moton, and when he came back in, Douglas was repeatedly stabbing L.T. in the back with a knife. Terry told Douglas to "come on," and snatched him up off of the victim. Terry testified that he previously had no idea that Douglas had a weapon.
Terry further testified that after they left L.T.'s house, they went back to Tiffany's house. Terry tried to cool down and snorted some cocaine. Tiffany asked about some blood on his pants. After leaving Tiffany's house, the men went to a gas station and bought some beer. Terry and Douglas moved around for the next several days to avoid contact with the police. Terry testified that Douglas believed that L.T. was dead.
Detective David Kent ("Det. Kent") of the Shreveport Police Department, an expert in crime scene and blood stain pattern analysis, testified at trial regarding the collection of evidence at the crime scene. An examination of L.T.'s robe led Det. Kent to conclude that it had been punctured a minimum of 24 times. He identified and explained photographs taken at the scene. No usable fingerprints were lifted from the scene. Det. Kent admitted on cross-examination that no physical evidence was found at the scene linking Douglas to the crime.
At the trial's conclusion, Douglas was convicted as charged. He filed a motion for modification of judgement, which was denied. The state filed its third felony habitual offender bill, and Douglas was subsequently adjudicated to be a third felony habitual offender. He was sentenced as a third felony habitual offender and ordered to serve 100 years imprisonment at hard labor for attempted second degree murder.[4] Douglas was also sentenced to serve 30 years imprisonment at hard labor for aggravated burglary, and 10 years imprisonment at hard labor for sexual battery. All three sentences were ordered to be served concurrently. The sentences for sexual battery and attempted second degree murder were ordered to be served without benefit of probation, parole or suspension of sentence. Douglas timely filed a motion to reconsider sentence, which was denied. This appeal followed.

DISCUSSION

Sufficiency of the Evidence
In his first assignment of error, Douglas argues that the verdict convicting him of attempted second degree murder, aggravated burglary, and sexual battery fails to meet the legal standard of sufficiency of the evidence. Specifically, Douglas asserts that the key issue is not whether the crimes were committed, but whether he was the person who committed the crimes and that the state failed to meet its burden of proving his identity as the perpetrator of the crime. Particularly, Douglas argues that the victim's identification of him was questionable because she only "tentatively" picked him out of the photographic lineups. Douglas further argues that J.M.'s eyewitness identification of him was "disputable."[5] Douglas *990 also maintains that Terry's testimony should not be considered credible because he had much to gain for testifying for the state. The defense reiterates that no physical evidence linked Douglas to the crime, concluding that the evidence was insufficient to support Douglas' conviction. For the following reasons, we conclude that this assignment of error has no merit.

Elements of the crimes
Although Douglas appears to concede that the three crimes were actually committed (only not by him), proof of the elements of these crimes will be discussed nonetheless.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.02/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App.2d Cir.09/27/00), 768 So.2d 687, writs denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1150, 2001-2087 (La.04/19/02), 813 So.2d 424. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984).
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.09/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.03/28/03), 840 So.2d 566, 2002-2997 (La.06/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.05/08/96), 674 So.2d 1018, writ denied, *991 96-1459 (La. 11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.06/26/98), 719 So.2d 1048.
Aggravated burglary is defined in La. R.S. 14:60 as:
... the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
La. R.S. 14:60.
The facts in the record, when viewed in the light most favorable to the prosecution, were sufficient to support the trial court's finding of all of the essential elements of the crime of aggravated burglary beyond a reasonable doubt. L.T.'s testimony, which was believed by the trial court, was sufficient support for the following requisite factual conclusions. Douglas entered her home without her permission while she and her children were present with the intent to commit a robbery or any theft therein. He was armed with a dangerous weapon (a knife) when he forced the entry. L.T.'s testimony also proved the alternative element that Douglas committed a battery upon her while in her home by repeatedly stabbing her with a knife. L.T.'s testimony had no internal contradiction or irreconcilable conflict with physical evidence. See State v. White, supra. In fact, the physical evidence supported these facts. Her testimony was also corroborated in part by testimony given by her son and Terry. The trial court found all of the state's witnesses to be totally credible. Thus, the evidence against Douglas was sufficient to support his conviction for aggravated burglary.
Douglas was also charged with and convicted of sexual battery pursuant to La. R.S. 14:43.1. At the time of the offense, this statute provided in pertinent part:
A. Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, ...:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender....[6]
Again, L.T.'s credible testimony, partially corroborated by the testimony of her son, was sufficient to prove that Douglas, who was not her spouse, touched her genitals with his hand without her consent. L.T.'s testimony had no internal contradiction or irreconcilable conflict with physical evidence. See State v. White, supra. Viewed in the light most favorable to the prosecution, the evidence was sufficient for the trial court to have found all the essential elements of the crime of sexual battery beyond a reasonable doubt. Again, the evidence against Douglas was sufficient to support his conviction for sexual battery.
Douglas was also convicted of attempted second degree murder. Second degree murder is a killing of a human being that occurs when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Huizar, 414 *992 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Musgrove, 33,977 (La.App.2d Cir.12/15/00), 774 So.2d 1155, writ denied, State ex rel. Musgrove v. State, XXXX-XXXX (La.09/28/01), 798 So.2d 112.
Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Van Sales, 38,138 (La.App.2d Cir.03/03/04), 867 So.2d 849. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Murray, 36,137 (La.App.2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, supra; State v. Van Sales, supra.
We have previously determined that it was reasonable for a jury to conclude that a defendant had the specific intent to kill or cause great bodily harm to support the conviction of second degree murder, given the number and nature of a victim's stab wounds. See State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454, writ denied, 02-0413 (La.01/24/03), 836 So.2d 37, cited in State v. Miller, 36,003 (La.App.2d Cir.07/25/02), 824 So.2d 1208, writ denied, 02-2480 (La.06/27/03), 847 So.2d 1253.
Here, the evidence, when viewed in the light most favorable to the prosecution, was sufficient under Jackson to support the trial court's finding of all of the essential elements of the crime of attempted second degree murder beyond a reasonable doubt. Douglas' specific intent to kill was reasonably inferred by the trial court from the circumstances and his actions, given the number and nature of L.T.'s stab wounds. See State v. Van Sales, supra. This intent was corroborated in part by Terry's testimony that Douglas thought he had killed L.T. This same evidence supported the finding of the other "gravamen" of the crime of attempted murder, whether first or second degree  the commission of an overt act tending toward the accomplishment of that goal. See State v. Huizar, supra.

Identification
In the case sub judice, Douglas specifically claims that he did not commit the aforementioned crimes and the evidence was insufficient to show he did. In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Powell, 27,959 (La.App.2d Cir.04/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.02/21/97), 688 So.2d 520.
A witness's failure to identify the suspect at a pretrial lineup is not grounds to bar the in-court identification; rather, it affects the weight of the testimony. Evidence may be introduced to explain any discrepancy. State v. Long, 408 So.2d 1221 (La.1982); State v. Ford, 26,422 (La.App.2d Cir. 09/21/94), 643 So.2d 293; State v. Chism, 591 So.2d 383 (La.App. 2d Cir. 1991). Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App.2d Cir.04/08/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12.
This record supports the trial court's finding that Douglas was the person who committed the crimes. Using the Jackson rationale, the state negated any reasonable probability of misidentification of this defendant, *993 carrying its burden of proof. See State v. Powell, supra. Douglas was positively identified by the victim, which alone may be sufficient to support a defendant's conviction. See State v. Davis, supra. The fact that L.T. made a "tentative" identification of Douglas at a pretrial lineup is not grounds to bar the in-court identification; rather, it affects the weight of the testimony. See Long, supra; State v. Ford, supra; State v. Chism, supra. L.T. got a good look at Douglas in the light of the hallway on the night of the crimes, and positively identified him as the perpetrator in court. It is not unreasonable to believe that L.T. would remember at trial the identity of a man who stabbed her over 20 times, as well as commit a sexual battery of her.
Moreover, her identification was corroborated by her son's in-court identification of Douglas, who saw him as he attacked his mother. Furthermore, the identification of Douglas as the person who committed the crimes was confirmed by the testimony of Terry. The trial court specifically stated for the record that all of the state's witnesses were "very credible" and "completely credible." This argument that the evidence was insufficient to prove Douglas' identify as the perpetrator of these crimes is without merit.

Sentencing
Douglas also raises three assignments of error related to his sentencing. Douglas argues that the trial court failed to consider his age, family ties, education or employment record, and the record does not reflect that adequate consideration was given to the codal guidelines in particularizing the sentence to him. He contends that as result of the trial court's failure to particularize the sentences to him, the imposition of excessive sentences resulted. Douglas also maintains that his sentence for aggravated burglary is excessive because it is disproportionate to the sentence received by Terry. Finally, he contends that the strong feelings expressed by the trial court at sentencing regarding the evidence presented at trial proves that no mitigating factors were taken into consideration.[7] It concludes that, without justification, the defendant's sentences must be set aside as excessive.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.06/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.04/02/97), 691 So.2d 864.
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 *994 (La.App.2d Cir.03/01/00), 754 So.2d 392, 394, writ denied, XXXX-XXXX (La.02/02/01), 783 So.2d 385; State v. Callahan, 29,351 (La.App.2d Cir.02/26/97), 690 So.2d 864, writ denied, 97-0705 (La.09/26/97), 701 So.2d 979.
Here, the record clearly indicates the trial court was aware of the matters urged by Douglas prior to imposing sentence. The trial court's consideration of mitigating circumstances is evidenced by its statement that it had reviewed and considered correspondence requesting leniency for Douglas. The trial court painstakingly set forth the facts and circumstances of the crimes and particularized these sentences to him.
Specifically, before sentencing, the trial court clarified for the record that there was never any plea bargain offer of any kind made to Douglas. The trial court stated that it had received and reviewed various correspondence from Douglas' friends and family requesting leniency. It mentioned Douglas' letter to the court in which he proclaimed his innocence of the crimes. The trial court gave a lengthy re-cap of the evidence adduced at trial and its reasons for judgment, including the credibility of the state's witnesses. It stated that it had reviewed the information contained in the pre-sentence investigation report.[8] The physical, emotional and economic impact of the crimes on the victim and her family was set forth. The trial court also discussed the nature and extent of Douglas' lengthy criminal record, which included what amounted to the forcible rape and beating of a woman in Minnesota, for which crime he was allowed to plead guilty to sexual assault. Douglas' age, family ties, former gang affiliation, former drug and alcohol use, educational level, and lack of any significant employment record were all set forth by the trial court in detail. The trial court also outlined and applied the sentencing guidelines set forth in La. C. Cr. P. art. 894.1 to the instant case and Douglas. This assignment of error is meritless.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra. As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender. State v. Grissom, 29,718 (La.App.2d Cir.08/20/97), 700 So.2d 541.
There is no requirement that co-defendants be treated equally by the sentencing judge. State v. Rogers, 405 So.2d 829 (La.1981); State v. Taylor, 485 So.2d 117 (La.App. 2d Cir.1986). The disparity of sentences between co-defendants is only a factor to be considered along with all other appropriate considerations in evaluating a contention that a sentence is excessive. State v. Quimby, 419 So.2d 951 (La.1982); State v. Jackson, 30,473 (La.App.2d Cir.05/13/98), 714 So.2d 87, writ denied, XXXX-XXXX (La.11/06/98), 727 So.2d 444.
*995 In this case, the record supports the trial court's imposition of maximum sentences for Douglas' crimes. Douglas perpetrated the most serious violations of the charged offenses and he is, indeed, the worst type of offender. See State v. Grissom, supra. It is hard to conceive of a scenario more horrifying and heinous than the one that unfolded on the night of these crimes. The crimes were predatory in nature because Douglas targeted and preyed upon a vulnerable young mother and her children, who he knew were home alone and unprotected. The danger created by the crimes to the victim and her family was grave. Douglas assaulted L.T. before the eyes of her terrified young children, and threatened the lives of those children in an attempt to gain cooperation. He brought another criminal into the home to steal and "choke out" the children, if necessary, while he brutally violated and repeatedly stabbed L.T. with a knife and then left her for dead. The resultant physical and emotional damage to the victim and her family was tremendous and permanent. Viewed in light of the harm done to society in general, and this victim in particular, the sentences imposed on Douglas do not shock the sense of justice. See State v. Hogan, supra; State v. Bradford, supra. Considering the circumstances of the case and Douglas' background, the sentences are not excessive.
Furthermore, Douglas' claim regarding the disparity between his sentence for aggravated burglary and that of Terry is without merit. There is no requirement that co-defendants be treated equally by the sentencing judge. State v. Rogers, supra; State v. Taylor, supra. These arguments and assignments of error are without merit.

Habitual offender bill of information
Finally, Douglas argues that two of his guilty pleas were defective and were insufficient for use as underlying offenses to support the habitual offender bill of information against him.
Specifically, Douglas maintains that his guilty plea in docket number 191,528 is defective for three reasons:
1) The trial court failed to inquire whether Douglas was satisfied with counsel;
2) The trial court failed to advise Douglas that pleading guilty to a felony could enhance the sentence he would receive if convicted of another crime in the future; and
3) The trial court failed to advise Douglas that he had a right to apply for post-conviction relief within three years of the date of the finality of conviction and sentence.
Douglas also argues that the guilty plea in docket number 199,700 is defective, because the trial court failed to inquire whether he was satisfied with counsel.
The state's burden of proof in habitual offender proceedings under La. R.S. 15:529.1 has been stated as follows:
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically *996 waived his right to trial by jury, his privilege against self-incrimination, and his right to confront his accusers. If the State introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that the defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boykin rights.
State v. Warfield, 37,616 (La.App.2d Cir.10/29/03), 859 So.2d 307, quoting, State v. Shelton, 621 So.2d 769 (La.1993) (footnotes omitted).
As stated herein, Douglas was charged with being a third felony habitual offender by a bill of information filed October 3, 2003. Douglas filed a motion to quash the habitual offender bill on October 28, 2003. At the habitual felony habitual offender adjudication proceeding, the state introduced the following evidence:
1) Exhibit S-1 in globo, a certified copy of a bill of information in docket number 191,528 in the First Judicial District Court, charging Douglas with illegal possession of stolen things in a felony amount and bearing his fingerprints, dated April 6, 1998, on the reverse side of the bill; a certified copy of the clerk of court's minutes in docket number 191,528, showing that Douglas was represented by counsel and advised of his rights per Boykin v. Alabama, and that he pled guilty to the charge of illegal possession of stolen things in a felony amount; and a certified copy of the guilty plea transcript from that same docket number; and
2) Exhibit S-2 in globo, a certified copy of a bill of information in docket number 199,700, charging Douglas with unauthorized entry of an inhabited dwelling and bearing his fingerprints, dated July 30, 1999, on the reverse side of the bill; a certified copy of the clerk of court's minutes in docket number 199,700, showing that he was represented by counsel and advised of his rights per Boykin v. Alabama, and that he pled guilty to the charge of unauthorized entry of an inhabited dwelling; and a certified copy of the guilty plea transcript from that same docket number;
A review of the record reflects that the state met its initial burden of proof in the habitual offender proceeding under La. R.S. 15:529.1, as stated in State v. Shelton, supra. Since Douglas denied the allegations of the bill of information, the burden shifted to the state to prove the existence of the prior guilty pleas and that Douglas was represented by counsel when they were taken. This proof was met by the testimony and exhibits introduced and set forth hereinabove. Although Douglas' objections made in his motion to quash the habitual felony habitual offender bill were noted for the record, the state then met any subsequent burden of proving the constitutionality of the plea. That is, the state introduced "perfect" transcripts of the taking of the guilty pleas, reflecting colloquies between the respective trial judges and Douglas, who in both instances was informed of and specifically waived his right to trial by jury, his privilege against self-incrimination, and his right to confront his accusers. Thus, the state, in fact, met its burden of proving that Douglas' prior guilty pleas were informed and voluntary, and made with articulated waivers of the three Boykin rights. See State v. Shelton, supra.
*997 Douglas offers no law to support its claim that the predicate offense guilty pleas were "defective" because the trial court failed to inquire whether he was satisfied with counsel. Although this type of inquiry is sometimes made as part of the trial court's determination of voluntariness, it is not a requirement for a valid guilty plea.
Douglas also cites as a "defect" in the guilty plea in docket number 191,528 that the trial court failed to advise him that pleading guilty to a felony could enhance the sentence he would receive if convicted of another crime in the future. Louisiana C. Cr. P. art. 556.1, before it was amended by Acts 2001, No. 243, § 1, required that the court advise a defendant regarding penalties for subsequent offenses. However, the comments to that article note that the requirement was removed when the article was amended. The change incorporates the Louisiana Supreme Court holding which found that advice was not required under this article, before the plea is taken, citing State v. Guzman, 99-1753 (La.05/16/00), 769 So.2d 1158. Specifically, Guzman held in part that, under the plain language of La. C. Cr. P. art. 556.1, clearly the failure of a trial judge to advise the defendant of the penalties for subsequent offenses under La. C. Cr. P. art. 556.1(E) is not reversible error. The court went on to apply the harmless error rule, which was later added to La. C. Cr. P. art. 556.1 by the aforementioned amendment. An application of Guzman to the instant case results in the same conclusion. Any failure to advise Douglas of penalties for subsequent offenses is not reversible error, and if error, was harmless. As reasoned in Guzman, in the absence of any particularized basis for this argument, it is hard to accept the contention that had Douglas known that a subsequent felony offense carried a more severe penalty than a first felony offense, he would not have pled guilty to the first felony offense. Such knowledge may have, and should have, affected his decision to commit a second or subsequent felony offense, but it clearly would not have been a material factor in his decision to plead guilty to the first offense. Douglas received the agreed-upon sentence of two years imprisonment at hard labor, suspended, and was placed on supervised probation. Thus, as in Guzman, supra, it is easy to find that any error in the La. C. Cr. P. art. 556.1 colloquy was harmless as to this defendant.
Finally, Douglas argues that the guilty plea in docket number 191,528 was defective because the trial court failed to advise him of the right to seek post-conviction relief within the applicable delays. La. C. Cr. P. art. 930.8 C requires that the trial court shall inform a defendant of the prescriptive period for post-conviction relief at the time of sentencing. However, this requirement does not impact the validity of Douglas' predicate offense guilty plea. As discussed hereinabove, the record shows that the state met its burden of proving that Douglas' prior guilty pleas were informed and voluntary, and made with articulated waivers of the three Boykin rights. See State v. Shelton, supra. This claim is without merit.

CONCLUSION
For the foregoing reasons, the convictions and sentences of Rodney L. Douglas are hereby affirmed.
AFFIRMED.
NOTES
[1] The victim's initials are used because of confidentiality requirements applicable to the instant case under La. R.S. 46:1844(W).
[2] F.M., who was 10 years old at the time of trial, also testified. She testified that she knew the difference between the truth and a lie; however, she did not remember anything about the crime and had a hard time answering most of the prosecutor's questions.
[3] The only promise made regarding Terry's sentence was that he would receive a minimum of 15 years.
[4] Douglas was originally sentenced on November 23, 2003 in the order of the severity of the offenses. Because of record-keeping matters, the original sentence was set aside and he was re-sentenced on December 5, 2003 in the order of the counts listed on the bill of information. The sentences were further clarified, and the trial court specifically incorporated the reasons for sentencing given in proceedings held November 23, 2003 into the record of the December 5, 2003 re-sentencing proceeding.
[5] On appeal, Douglas inaccurately argues that J.M. testified that he could not clearly see the person attacking his mother. The trial transcript reflects that J.M. got "a look" at the man attacking his mother, and described his clothing and partial state of undress. On cross-examination, J.M. described the angle of his view. However, whether J.M. could not clearly see the attacker was never established as a fact and appears to be Douglas' own conclusion on appeal.
[6] La. R.S. 14:43.1 was subsequently amended by Acts 2003, No. 232, § 1.
[7] The defense specifically cites the trial court's reference to Douglas as an "animal."
[8] In the summary, the probation and parole officer expressed his opinion that the defendant has proven by his behavior that he is an extremely dangerous individual.