**DO NOT PUBLISH**

## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 12-1188

**STATE OF LOUISIANA**

**VERSUS**

**DEBRA SUE SCHJENKEN**
**a/k/a DEBRA SUE HEWITT**
**a/k/a DEBRA ODIR**

\*\*\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**
**FIFTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF LAFAYETTE, NO. 129172.1**
**HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

**J. DAVID PAINTER**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**

**Edward J. Marquet**
**P. O. Box 53733**
**Lafayette, LA 70575**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Debra Sue Schjenken a/k/a Debra Sue Hewitt a/k/a Debra Odir**

**Michael D. Harson**
**District Attorney**
**Patrick D. Magee**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PAINTER, Judge.**

Defendant, Debra Sue Schjenken a/k/a Debra Sue Hewitt a/k/a Debra Odir, appeals her conviction of second degree murder and her sentence of life in prison at hard labor, without benefit of parole, probation, or suspension of sentence. For the following reasons, the conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

In Lafayette, Louisiana, sometime between January 25 and 27, 2010, Defendant, who has only one leg and is confined to a wheelchair, and John Romine stabbed, bludgeoned, and choked the victim, Dwayne Ball, to death in a field where they had been camping as homeless people.

Defendant was indicted for second degree murder, a violation of La.R.S. 14:30.1. On March 3, 2011, the trial court appointed a sanity commission. Defendant was deemed competent to assist defense counsel during trial. Defendant filed a "Motion to Suppress" on January 6, 2011. Following testimony and argument, the trial court denied the motion in open court. A jury trial commenced on March 19, 2012, and on March 21, the jury returned a verdict of second degree murder. Defendant was sentenced to life in prison without the benefit of parole, probation, or suspension of sentence.

Defendant has perfected a timely appeal and asserts two assignments of errors: 1) the evidence was insufficient to sustain the verdict of second degree murder; and 2) the trial court erred when it denied Defendant's objection to the admission at trial of her statements given to the police during interrogation.

1

# DISCUSSION

*Errors Patent*

All appeals are reviewed for errors patent on the face of the record as required by La.Code Crim.P. art. 920. After reviewing the record, we find none.

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to sustain the verdict of second degree murder. She asserts that she was acting in self-defense when she stabbed the victim in the leg, which caused a non-life threatening injury, and there was no physical evidence that she contributed to Mr. Ball's death otherwise.

Second degree murder is defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A). In *State In re D.P.B.*, 02-1742, pp. 4-6 (La. 5/20/03), 846 So.2d 753, 756-57 (footnote omitted) (alteration in original), wherein the accused asserted justifiable homicide, the supreme court observed:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). . . . Furthermore, in a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown,* 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a

2

reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

At trial, the following evidence was given: As a result of an anonymous tip, Dwayne Ball's partially decomposed body was located in a field behind Mike Baker Brick Company in Lafayette. The anonymous tipster also supplied the name of the victim and a suspect. The victim was found in an area commonly used by homeless people. The body was wrapped in blankets, sheets, and a comforter. A seven and a half inch knife was sticking out of a pants leg of the victim's jeans, just above his boot. A long, serrated knife was also located at the edge of the field. Various items were collected from the crime scene and sent to Acadiana Crime Laboratory for analysis.

Doctor Joel Carney, a forensic pathologist, conducted the autopsy on the victim's body. He could not pin-point one single cause of death. He stated that the cause was "multifactorial." The body had a stab wound to the thigh of the left leg. There was evidence of blunt force trauma to the face—the maxilla was fractured, but that area of the victim's face was badly decomposed, and the extent of the trauma could not be discerned. There was also some indication of trauma to the victim's skull, both in front and in back. There was a bruise on the victim's chest which indicated a blunt force trauma. Dr. Carney testified that there was no real evidence of strangulation; however, he explained that the state of decomposition around the face and neck was such that precluded exact findings.

Detective Ben Suire and Lieutenant Bryan Racca, both with Lafayette City Police Department, interviewed Defendant, whose name was given to them by the anonymous tipster. The interview was recorded in two parts, and an audio CD of

3

the interview was played for the jury. Initially, Defendant told Detective Suire that she had not seen the victim in a few weeks and that he had gone to Kentucky to visit his sick father. She said that he wanted her to go with him, but she did not want to go. She acted very surprised when she heard that he was dead. After Detective Suire indicated to her that he believed she already knew he was dead, she refused to speak with him anymore. At that point, Lieutenant Racca took over the interview. Shortly thereafter, Defendant admitted that she lied about not knowing what happened to the victim. She admitted that she and John Romine fought with the victim at the campsite they had been occupying together in the field behind Mike Baker Brick Company. She said that she had been dating the victim but broke up with him a few weeks prior. He began stalking her and then threatened to kill her by cutting her throat. She said that he had been abusive to her. When she and Mr. Romine went to the campsite to get her clothes, he attacked them both with a knife. She said that Mr. Romine began beating up the victim. At one point, she stabbed the victim in the leg to protect herself. She told Detective Suire and Lieutenant Racca that Mr. Romine managed to get a strip of a sheet used to tie a tarp to a tree at the campsite and strangled the victim with it, despite her screaming at him to quit. She said that she was unable to help the victim because she could not get out of the wheelchair, even though she had her prosthetic leg on at the time. She said that Mr. Romine then dragged the victim's body to a different campsite and covered the body with a mattress. After, as they went back to town, she tossed the knife with which she stabbed the victim down a storm drain.

Jack Stovall, who was also homeless at the time of the incident, testified that he was a friend of Defendant's. He stated that he knew the victim and that he had a reputation for being mean, abusive, and for carrying a knife at all times. He said

4

that Defendant and Mr. Romine came to his camp and told him that the victim had gone back to Kentucky, but then she later told him that she had stabbed the victim.

Leif Przytulski testified that he witnessed the killing of the victim. He had known Defendant and Mr. Romine only a few days. He stated that he was wandering the streets when he met Defendant and was invited to stay with her and Mr. Romine in their camp for one night. The next day, he went to the hospital to undergo an MRI for migraine headaches. Afterwards, he looked around downtown for Defendant and Mr. Romine. When he did not find them, he went to the camp to get his bag. There, he found the victim sitting on a pile of stuff, including Mr. Przytulski's bag, drinking beer and smoking marijuana. He attempted to get his bag, but the victim said it now all belonged to him and urinated all over the pile. Mr. Przytulski left and eventually ran into Defendant and Mr. Romine in town. He told them about the victim claiming all the stuff in the camp was his and urinating on everything. They told Mr. Przytulski they would handle it. Mr. Przytulski stayed in town at a karaoke bar until a little before midnight, then went to the camp. However, before he arrived at the camp, he heard arguing. He crept up to the camp, hiding in the weeds, and saw Defendant, Mr. Romine, and the victim arguing. He said that he saw Mr. Romine throw the victim down and get on top of him. He said that the victim was right in front of Defendant's wheelchair and that she stomped on his face with her prosthetic foot several times. She then took off the leg and began to beat him around the face and head with the leg. "She was just saying, this is the end of it for you."

According to Mr. Przytulski, at some point, the victim got loose. Mr. Romine threw him back down. The victim managed to pull a knife out from his boot and cut Mr. Romine but then dropped the knife. Defendant grabbed the knife

5

from the ground and stabbed the victim "for a while." Mr. Romine got a hold of a strip of sheet and strangled the victim until he was dead. Mr. Przytulski said that they discussed what to do with the body. Mr. Romine pulled the body away and put a mattress on top of the body. Just about this time, Mr. Przytulski made a noise that Defendant and Mr. Romine heard. He attempted to run away, but Mr. Romine caught him. Defendant and Mr. Romine threatened that if he said anything to anyone, he would end up like the victim.

During cross examination, Mr. Przytulski repeatedly stated that the incident took place in 2006 or 2007. He attempted to describe where he had been during the time from the murder until he was contacted by the police in Michigan to testify. His testimony was confusing as to dates and places. However, very shortly after the killing, he was jailed in Iberia Parish on a charge of theft of an automobile. On March 8, 2010, Detective Ben Suire interviewed him at the parish jail about the murder.

Defendant testified on her own behalf. She said that she had been homeless for about six months and had been dating the victim during that time. However, he was abusive so she broke up with him a few weeks prior to his death. She described an incident where he took a serrated knife and rolled it across her neck and told her that he was going to cut her throat. She began seeing Mr. Romine. She stated that they met Mr. Przytulski two days prior to the incident, and he stayed at their camp with them the night before the murder. She said that she went to the camp with Mr. Przytulski and Mr. Romine to get all her stuff because they were moving to a different camp. They found the victim lying on the pile of their things. He threatened to kill them all and pulled out two knives, one of which was the bread knife with which he had threatened her earlier, and attacked them. Defendant

6

stated that earlier in the day, a friend gave a pocketknife to Mr. Romine, and he gave the knife to her. She said that she opened the knife and tucked it under her leg. Mr. Romine was standing next to her wheelchair when the victim attacked them. As Mr. Romine blocked the victim from swiping at her with the knives, she pulled out her knife and "poked" him in the leg. She said that although the victim managed to cut Mr. Romine, Mr. Romine threw him to the ground. Mr. Romine got on top of the victim and beat him on the face. She said that she and Mr. Przytulski were too shocked to help the victim. She said that she screamed at Mr. Romine to stop. When he turned towards her, the victim attempted to escape, but Mr. Romine yelled for Mr. Przytulski to stop the victim. According to Defendant, Mr. Przytulski pushed the victim back down to the ground. Mr. Romine then used the sheet to strangle the victim to death, and all the while, she screamed for him to stop. She said that he pulled the victim's body off into the woods. She was not sure what he did with the body after that. She stated that she wanted to do CPR on the victim, but Mr. Romine assured her that he was dead. She testified that when she and Mr. Przytulski wanted to call the police, Mr. Romine threatened to kill them if they did.

Defendant further testified that Mr. Przytulski's version of the event was not correct; particularly, that she did not stomp on the victim's face with her prosthetic leg and that she would have had to take off her jeans first before she could get the prosthesis off the stump in order to hit the victim with it.

In brief, Defendant argues that "[i]n response to questioning by the prosecutor, Leif said that the defendant grabbed the knife and started stabbing Dwayne with it 'for a while'. The clear impression is that the defendant stabbed the victim multiple times." Defendant argues that considering Dr. Carney's testimony

7

that there was only one stab wound to the victim's leg, Mr. Przytulski's testimony that Defendant stabbed the victim several times in the chest area demonstrated the "utter incredulousness" of his testimony. In he absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed, is sufficient support for a requisite factual conclusion. *State v. Darbonne*, 01-39 (La.App. 3 Cir. 6/6/01), 787 So.2d 576, *writ denied*, 02-533 (La. 1/31/03), 836 So.2d 64. Accordingly, Defendant contends that because Mr. Przytulski's testimony was in irreconcilable conflict with the physical evidence, he cannot be believed.

During Mr. Przytulski's direct examination, there was no other mention of how many times or where Defendant stabbed the victim. However, during cross examination, Mr. Przytulski testified that Defendant stabbed the victim about twice in the upper part of the body, probably around the ribcage.

Defendant also points out that Mr. Przytulski stated during trial that the incident took place in 2006 or 2007, when in fact the killing took place in February 2010. However, Mr. Przytulski sent Detective Suire a letter on February 23, 2010, from the Iberia Parish jail, describing the incident as he saw it. The events as described by Mr. Przytulski at trial were substantially consistent with the events as described in the letter. In the letter, he mentioned that Defendant stabbed the victim but did not say how many times or where. In the interview conducted with Mr. Przytulski at the jail on March 8, 2010, there was no mention of a stabbing other than that the victim had a knife and cut Defendant and Mr. Romine.

However, Defendant admits that she stabbed the victim one time, albeit in the leg, which was substantiated by the physical evidence. When Defendant confessed to Detective Suire and Lieutenant Racca that she was present when the

8

victim supposedly attacked her and Mr. Romine, she made no mention of Mr. Przytulski's presence. If the events were as she described them at trial, then Mr. Przytulski's corroboration would have supported her contention that she and Mr. Romine initially acted in self-defense. His corroboration of her attempt to dissuade Mr. Romine from choking the victim to death could have exhibited her lack of intent to kill or inflict great bodily harm. Yet she said nothing to the officers about Mr. Przytulski.

Despite Mr. Przytulski's confusion as to dates, the jury believed Mr. Przytulski's version of the events over Defendant's version. "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Douglas,* 39,036, p. 10 (La.App. 2 Cir. 10/29/04), 888 So.2d 982, 990, *writ denied*, 04-3146 (La. 4/1/05), 897 So.2d 601. While both Defendant and Mr. Przytulski testified that it was Mr. Romine who strangled the victim to death, Defendant admitted stabbing him. Mr. Przytulaki testified that she kicked him and hit him and encouraged Mr. Romine to finish the job. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Martin,* 92-811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411; La. R.S. 14:10(1). We find that the State met its burden of establishing that Defendant's actions were not justified under the circumstances in this case. The evidence was sufficient to support the jury's verdict beyond a reasonable doubt.

*Diminished Mental Capacity*

Defendant contends that the trial court erred when it allowed "Defendant's admission to the law enforcement investigator due to the defendant's diminished

mental capacity caused by the consumption of alcohol and multiple narcotic and non-narcotic medications."

Defendant was taken into custody on March 4, 2010. She was *Mirandized* and interrogated. She filed a motion to suppress the statements on January 6, 2011. A hearing was held on March 11, 2011. Following testimony from Detective Suire and Lieutenant Racca, the trial court heard the arguments and ruled that the "statement was freely, voluntarily, willingly, and intelligently, and knowingly given" and denied the motion.

However, at trial, Defendant again objected to the statements being given to the jury for the same reasons argued at the hearing. Again, Detective Suire and Lieutenant Racca testified regarding whether Defendant was intoxicated to such a degree that she was suffering diminished mental capacity. At the time that statement was taken, Detective Suire asked Defendant to list all medications and intoxicants she had taken within the last twelve hours. She advised him that she was taking medication for lupus and had stents in her legs. She then listed twelve medications including pain killers, blood thinners, antidepressants, aspirin, ibuprofen, and three ounces of whiskey and one half of a beer. Detective Suire testified that he had had years of experience dealing with intoxicated persons and would not have interrogated her if she appeared to be intoxicated to such a degree as not to understand what she was saying and to whom she was saying it.

A review of the audio CD of the interview does not indicate that Defendant was intoxicated such that she did not know what she was saying or to whom. In *State v. Bowers*, 39,970 (La.App. 2 Cir. 8/19/05), 909 So.2d 1038, the defendant filed a motion to suppress her statements made to the police regarding armed robbery allegations. She argued that she told the police that she was intoxicated on

10

alcohol and cocaine when she gave her statements, and the police made no effort to

determine if she was in a condition to understand and waive her rights. The trial

court denied the motion. On appeal, the second circuit noted:

> The admissibility of a confession is a question for the trial
> court. *State v. Roddy*, [33,112 (La.App. 2 Cir. 4/7/00), 756 So.2d
> 1272, *writ denied*, 00-1427 (La. 5/11/01), 791 So.2d 1288] *supra.*
> When determining admissibility, the trial court's conclusions on the
> credibility and weight of the testimony with regard to the voluntary
> nature of the confession will not be overturned on appeal unless not
> supported by the evidence. *State v. Benoit*, 440 So.2d 129 (La.1983);
> *State v. Roddy, supra*; *State v. Dailey*, 607 So.2d 904 (La.App. 2d
> Cir.1992), citing *State v. Jackson*, [381 So.2d 485 (La.1980)] *supra.*
> We place great weight upon the trial court's factual determinations
> because of its opportunity to observe the witnesses and assess
> credibility. *State v. Roddy, supra; State v. Crews*, 28,153 (La.App. 2d
> Cir.5/8/96), 674 So.2d 1082. Testimony of the interviewing police
> officer alone may be sufficient to prove that the statement was given
> freely and voluntarily. *State v. Henderson*, 31,986 (La. App. 2d
> Cir.8/18/99), 740 So.2d 240. *See State v. Trotter,* 37,325 (La.App. 2d
> Cir.8/22/03), 852 So.2d 1247, *writ denied*, 2003-2764 (La.2/13/04),
> 867 So.2d 689.
>
> Intoxication may render a confession involuntary if it negates a
> defendant's comprehension and renders him unconscious of the
> consequences of what he is saying; whether intoxication exists and to
> a degree sufficient to vitiate voluntariness are questions of fact. *State
> v. Bourque*, 622 So.2d 198 (La.1993); *State v. Narcisse*, 426 So.2d
> 118 (La.1983). However, the mere fact of drug or alcohol intoxication
> is insufficient standing alone to render a confession involuntary. *See
> State v. Davis*, 92-1623 (La.5/23/94), 637 So.2d 1012 (confession
> voluntary although defendant had smoked three or four cocaine rocks
> the night before his 11:00 p.m. statement, as well as consumed several
> beers the day he confessed).

*Id.* at 1046-47.

In *Bowers*, the second circuit noted that the officer who conducted the

interrogation testified that the defendant did not slur her words or act intoxicated.

He noted that she had the presence of mind "to initially give a false name in an

effort to avoid being arrested on outstanding warrants." *Id.* at 1047.

Similarly, in the current case, Defendant initially lied about her involvement in the victim's death. She acted surprised at hearing about his death. She elaborated on her story, telling the police that the victim had gone to Kentucky to visit his ailing father and had wanted her to go with him but that she declined. When asked, she gave the detective a list of medications she was taking, even the exact amount of whiskey she drank—three ounces. When Defendant finally confessed her involvement, she told a clear story of how the victim attacked her and Mr. Romaine, how they defended themselves, and how Mr. Romaine strangled the victim despite her protestations.

Under the circumstances of this case, the trial court did not err when it permitted the admission of Defendant's statements to the police. The matter had been ruled upon earlier. The trial court denied the motion to suppress, and Defendant did not file for a supervisory review of the trial court's ruling. At trial, the trial court upheld the previous ruling and allowed the admission of the statements. The trial court did not err.

## CONCLUSION

For these reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**