968 So.2d 1152 (2007)
STATE of Louisiana, Appellee
v.
Brady ALSUP, Appellant.
No. 42,636-KA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 2007.
*1155 Louisiana Appellate Project by Paula C. Marx, Lafayette, J. Chris Guillet, for Appellant.
William R. Jones, District Attorney, Robert E. Bethard, Assistant District Attorney, for Appellee.
Before STEWART, PEATROSS & LOLLEY, JJ.
PEATROSS, J.
Defendant, Brady Alsup, was convicted of simple burglary of an inhabited dwelling, a violation of La. R.S. 14:62.2. He was sentenced to eight years at hard labor. Defendant now appeals his conviction and sentence. For the following reasons, Defendant's conviction and sentence are affirmed.

FACTS
On April 16, 2006, Easter Sunday, Ralph Wilson went to church as usual at approximately 9:45 a.m. and did not return to his home until approximately 12:30 p.m. When Mr. Wilson returned home, he found his entry door unlocked; and, once inside, he found the door to his home office open. Mr. Wilson always kept the door to the office closed. Believing that his daughter had been in his home, Mr. Wilson contacted her to scold her for leaving the office door open. When his daughter stated she had not been in his home, Mr. Wilson simply gave no further thought to the matter at that time.
Several days later, a representative from his bank contacted Mr. Wilson inquiring about a check. He had not recently written a check for that particular amount; and, after investigating, he found checks missing from his office. Two accounts, a personal account and a business account, had checks missing from the check registers. A total of 15 checks were missing from the registers. The missing checks had been removed from the middle of the personal account checks and the end of the business account checks; therefore, it was not readily apparent that they were missing.
Police investigating the incident found a broken window at the back of Mr. Wilson's house. The police were unable to find any usable prints from the window or from within the office, but the police were subsequently able to determine that Defendant, a family friend of Mr. Wilson, was a prime suspect. Defendant had used the stolen checks to make several purchases in the area and was eventually arrested for the crime.

DISCUSSION
Defendant argues that the State failed to present sufficient evidence to establish the essential elements of the charged offense. Specifically, Defendant alleges that the State failed to establish the element of unauthorized entry into the victim's residence, but relied upon the fact that Defendant was found to be in possession of the victim's checks to establish the burglary. The State contends that the direct and circumstantial evidence presented was sufficient to support the conviction, including finding that Defendant had, in fact, entered the victim's residence.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond *1156 a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Mims, 39,757 (La. App. 2d Cir.6/29/05), 907 So.2d 237; State v. Turner, 591 So.2d 391 (La.App. 2d Cir. 1991), writ denied, 597 So.2d 1027 (La. 1992).
In all cases where an essential element of the crime is not proven by direct evidence, the evidentiary rule on circumstantial evidence, La. R.S. 15:438, applies. It restrains the fact finder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Lilly, supra. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Hammontree, 363 So.2d 1364 (La. 1978); State v. Van Sales, 38,138 (La.App. 2d Cir.3/3/04), 867 So.2d 849, writ denied, 04-1305 (La.4/22/05), 899 So.2d 569. The court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, supra. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78; State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When the conviction is based on both direct and circumstantial evidence, an appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that a defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987); State v. Adkins, 39,724 (La.App. 2d Cir.6/29/05), 907 So.2d 232, writ denied, 06-2514 (La.5/4/07), 956 So.2d 607; State v. Lott, 535 So.2d 963 (La.App. 2d Cir. 1988).
*1157 To convict a defendant of simple burglary of an inhabited dwelling, the state is required to prove that a defendant entered an inhabited dwelling with the intent to commit a felony or theft therein.[1] A defendant's intent to commit burglary of an inhabited dwelling may be inferred from circumstances surrounding the commission of the offense. State v. Jones, 38,579 (La.App. 2d Cir.8/18/04), 880 So.2d 962, writ denied, 05-0333 (La.5/13/05), 902 So.2d 1017.
In the case sub judice, the State presented the testimony of several witnesses at trial, including the victim, Mr. Wilson, who was "eighty-eight [years] and three days old" at the time of the trial. In addition to the events detailed above, Mr. Wilson testified that he had known both Defendant and his mother for all of their lives. Defendant had visited Mr. Wilson's home periodically and was familiar with the layout of the house.
Mr. Wilson also identified several checks that had been written on both his personal account, as well as his business account. Mr. Wilson indicated that he had not written the checks, nor had he given anyone permission to write the checks. Mr. Wilson also testified that he had not given anyone permission to remove the checks from the checkbook. After the checks were found missing, Mr. Wilson closed the accounts.
After finding that checks were missing from his office, Mr. Wilson searched to determine where a person may have entered his home. He found that a window pane in the back bedroom of his house had been cracked out and there was also a hole in the screen. The cracked pane and the hole in the screen were near the latch for the window, which was four feet from the ground. The window was large enough for a "pretty big man" to crawl through. On cross-examination, Mr. Wilson testified that he did not actually see anyone break into his home.
Detective Vernon Perrin of the Red River Parish Sheriff's office testified that he investigated the burglary of Mr. Wilson's home. Mr. Wilson informed Detective Perrin that someone had been in his office, but he was unsure how the person may have entered. Mr. Wilson also told Detective Perrin that checks had been taken from his home. Detective Perrin confirmed that a window in the back bedroom of the house had been cracked and there was a small hole that allowed access to the window lock. Detective Perrin was able to use a pocket knife to unlock the window and open the window. The window and the office were dusted for fingerprints, but no identifiable prints were found.
Ms. Janette Mason, a store manager with Advance Auto Parts, testified that she was called to approve a check purchase involving Defendant. As a part of the ordinary practice of the store, checks over a certain amount must receive a manager's approval. The check in the amount of $530.24 was tendered on April 17, 2006. While the date written on the check was "2005," Ms. Mason pointed to the register stamp on the back of the check that contained a date stamp showing the "2006" date. Ms. Mason recalled that she checked Defendant's driver's license and it matched what was on the check. The check was one from Mr. Wilson's account and the license also had that same name, Ralph Wilson. Ms. Mason identified Defendant *1158 in court as the person who presented the check and the driver's license in the name of Ralph Wilson. Ms. Mason was able to remember "Mr. Wilson" because his truck leaked diesel in the parking lot of the store, and "Mr. Wilson" assisted Ms. Mason and one of her employees in cleaning up the spill.
On another occasion, Defendant was in the store attempting to return some of the items he previously purchased. Defendant had initially attempted to return the items to another Advance Auto Parts store; but, because of the policies of the store, the return had to be made at the original store where the items had been purchased. When Defendant appeared at Ms. Mason's store again, she informed him that he would have to wait at least ten days from the date of the purchase, which had not elapsed, to receive a cash refund.
Shirley Dumas, another employee of Advance Auto Parts at a different location, testified that her store was equipped with a video surveillance camera that recorded individuals who entered the store. Ms. Dumas presented a DVD of images taken in her store in April 2006. An individual, identified in court as Defendant, attempted to return items to Ms. Dumas' store. Since the items were valued in excess of $500 and the ten-day waiting period for the check purchase had not elapsed, Defendant was told that the return would have to be made at the store where the purchase was originally made. Defendant then left with the items he was attempting to return. The surveillance video was played for the jury. In the video, Defendant could be seen entering the store with a bag in his hands and later exiting the store with the same bag.
Belinda Alsup, Defendant's former wife, testified on behalf of the State. At the time of the trial, Ms. Alsup was incarcerated after having pled guilty to several criminal charges, including accessory after the fact to the burglary of Mr. Wilson's home. Ms. Alsup stated that she had not received any plea agreements or reduced sentence in exchange for her testimony in the instant matter. Ms. Alsup testified that she was acquainted with Mr. Wilson through Defendant and his family.
On Easter 2006, Ms. Alsup recalled that she was with Defendant in their RV near Defendant's mother's home. Defendant left the RV some time between 11:00 a.m. and 12:00 p.m. that day. Ms. Alsup was readying herself and the couple's baby to meet with Ms. Alsup's other child when Defendant returned to the RV. Upon his return, Ms. Alsup noticed that Defendant had what looked like cobwebs in his hair. After a brief conversation with Ms. Alsup, Defendant went to his four-wheeler and returned with some checks. Since Ms. Alsup could not be late to meet with her daughter, she told Defendant that they would talk later and left the RV. Ms. Alsup recalled that the checks belonged to Ralph Wilson. Ms. Alsup did not stay with Defendant on Easter night and did not see him again until April 19, 2006, when they went shopping. On the day of the shopping trip, Ms. Alsup noticed that Defendant had new tires on his truck and that the truck had been "jacked up." There were also tools in the truck and Defendant had purchased a new computer.
The couple shopped at Abercrombie and Fitch where a check on Mr. Wilson's account in the amount of $1,518.39 was presented for merchandise. Defendant presented the check for the items; Ms. Alsup's items totaled $450. Defendant was asked for identification and produced a driver's license bearing his picture and Ralph Wilson's name and address.
On cross-examination, in responding to questions from defense counsel who was attempting to forward the theory that Ms. *1159 Alsup and her ex-husband, Kevin Bounds, had actually committed the burglary, Ms. Alsup acknowledged that she still maintained a close relationship with Mr. Bounds at the time of the commission of the burglary. Ms. Alsup stated that she maintained the relationship because she had a child with Mr. Bounds. When questioned about being offered any incentive to testify, Ms. Alsup stated that she had not received any incentive and had not told anyone that she had. As she was further questioned regarding this point, Ms. Alsup insisted that, because her five-year sentence involved multiple charges, her sentence was not affected by her testimony in the case sub judice.
Defendant's mother, Mrs. Marsha Nelson Alsup Loftin, was caring for Ms. Alsup's child during her incarceration and Ms. Alsup admitted she made collect calls to Defendant's mother for the main purpose of discussing Ms. Alsup's child. Anticipating conflicting testimony from Mrs. Loftin regarding statements Ms. Alsup purportedly made in those conversations, defense counsel questioned Ms. Alsup regarding several statements she allegedly made to Mrs. Loftin. Ms. Alsup denied that she entered the Wilson home to take the checks. She also denied telling anyone that she or Mr. Bounds entered the home. Ms. Alsup specifically denied giving this information to Defendant's mother in any of their telephone conversations. After Ms. Alsup's testimony, the State rested its case.
The defense called one witness, Mrs. Loftin, Defendant's mother. Mrs. Loftin testified that, on April 15, 2006, the day before the burglary, Defendant called her asking if she had seen his wife. Mrs. Loftin indicated that she had not seen her and noted that Ms. Alsup frequently left without explanation. According to Mrs. Loftin, Defendant was working in Lake Charles at the time of the call. Mrs. Loftin stated that Defendant and his young child were to come to the property across from her house that evening and stay in his camper. When Defendant arrived, they discovered that the electricity had not been installed on the property, so Defendant and his son stayed at Mrs. Loftin's house.
Mrs. Loftin stated that, on Easter Sunday, she did not go to church as usual so that she could spend time with Defendant and her grandson. They ate breakfast that morning and had an Easter egg hunt as it was her grandson's first Easter. The group then had lunch before taking a nap. After the nap, Mrs. Loftin recalled spending more time visiting with her son after dark and then he and her grandson drove back to Lake Charles. Mrs. Loftin testified that Defendant did not leave her house anytime during that day before returning to Lake Charles.
During the time Ms. Alsup was incarcerated, she would call Mrs. Loftin to check on the baby. As stated, at that time, Mrs. Loftin was raising the child while Defendant worked. According to Mrs. Loftin, during one telephone call with Ms. Alsup, Mrs. Loftin questioned Ms. Alsup about what "going on" with her. Mrs. Loftin testified, "I'm nosey, I wanted to get what I could get out of her. And, she offered it." According to Mrs. Loftin, Ms. Alsup stated that she had been offered a deal. Mrs. Loftin did not receive any details on this comment as the call was interrupted when the baby started crying. On another call, Mrs. Loftin stated that she was questioning Ms. Alsup and asked what she and Kevin Bounds got for their crimes. Mrs. Loftin stated that Ms. Alsup began to explain her deal; then, when questioned about the Wilson burglary, Ms. Alsup said, "what if I was to tell you that Kevin and I went in there?" Mrs. Loftin tried to follow *1160 up on the comment and Ms. Alsup giggled; then this call was also interrupted by the baby crying.
On cross-examination, Mrs. Loftin again stated that Defendant went to Lake Charles on April 16, 2006. Defendant called that evening to confirm that he had reached Lake Charles. Mrs. Loftin did not hear from Defendant for several days after that evening, and she could not say whether or not Defendant was in Lake Charles on the days immediately following the burglary. Mrs. Loftin noted that her son's picture was on the driver's license with Mr. Wilson's name and address. After viewing the Advance Auto Parts video, Mrs. Loftin did not believe the person in the video was her son, but she could not say conclusively that her son had not entered the store on that day. Finally, when questioned about an alleged deal that Ms. Alsup may have received, Mrs. Loftin stated that someone receiving concurrent sentences might consider that a deal. The defense rested its case at the conclusion of Mrs. Loftin's testimony.
The record reflects that the State presented sufficient direct and circumstantial evidence to convict Defendant of simple burglary. The evidence shows that someone entered Mr. Wilson's home without permission, possibly through a back window, and removed checks from his home office. Mr. Wilson clearly stated that it was not readily apparent that anything had been disturbed in the home. One could infer, from those circumstances, that the person who entered was familiar with Mr. Wilson and his home and knew where to obtain the checks. One could also infer that the person then went directly to the checks, without disturbing any other items. The State presented circumstantial evidence to show that, because they were well acquainted, Defendant was likely familiar with Mr. Wilson's home and his Sunday routine of attending church. The evidence links Defendant to the crime in that he left his RV during the time that Mr. Wilson was in church and returned sometime later with the checks and cobwebs in his hair. Later, Defendant altered his driver's license to make purchases using the checks taken from Mr. Wilson's home.
The defense attempted to establish alternate theories of the burglary, specifically that Defendant's wife and her ex-husband entered the home. These theories apparently were not believed by the jury. As the State points out in its brief, the theory would not seem plausible because Defendant was the only person who had possession of the checks and received the majority of the benefits from the proceeds of the burglary.
The evidence presented establishes that Defendant entered Mr. Wilson's home without permission, an unauthorized entry, and removed checks, an item of value, from his home office. Defendant later used the stolen checks to purchase items, including clothing, computers and auto parts. Considering the evidence in its totality, the State was able to present sufficient evidence to establish the essential elements of the charged offense. This assignment is, therefore, without merit.

Evidence of Other Crimes
Defendant alleges that the trial court erred in allowing prejudicial evidence of other crimes since the State did not establish an illegal entry into Mr. Wilson's home, nor did it link any illegal entry to Defendant. The State counters that the other crimes evidence was presented at trial as part of the res gestae and, thus, were admissible during the trial.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that Defendant will be convicted of the present offense *1161 simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. art. 404(B)(1); State v. Jackson, 625 So.2d 146 (La.1993). This rule of exclusion stems from the "substantial risk of grave prejudice to Defendant" from the introduction of evidence regarding his unrelated criminal acts. State v. Prieur, 277 So.2d 126 (La.1973). Evidence of other crimes, however, may be admissible if the State establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1); State v. Roberson, 40,809 (La.App. 2d Cir.4/19/06), 929 So.2d 789. Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403; State v. Jacobs, 99-0991 (La.5/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002); State v. Hatcher, 372 So.2d 1024 (La.1979).
A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Cooks, 36,613 (La.App. 2d Cir.12/4/02), 833 So.2d 1034; State v. Butler, 30,798 (La.App. 2d Cir.6/24/98), 714 So.2d 877, writ denied, 98-2217 (La.1/8/99), 734 So.2d 1222.
Evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that forms an integral part of the act or transaction that is the subject of the present proceedings. La. C.E. art. 404(B)(1); State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074; State v. Coates, 27,287 (La.App.2d Cir.9/27/95), 661 So.2d 571, writ denied, 95-2613 (La.2/28/96), 668 So.2d 365. Such evidence of integral acts, or res gestae, is admissible under La. C.E. art. 404(B)(1) without requiring the State to give Prieur notice or the trial court conducting a Prieur hearing. State v. Boyd, 359 So.2d 931 (La. 1978); State v. Mandosia, 36,827 (La.App. 2d Cir.4/9/03), 842 So.2d 1252. The test of integral act evidence is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074; State v. Gaddis, 36,661 (La.App. 2d Cir. 3/14/03), 839 So.2d 1258, writ denied, 03-1275 (La.5/14/04), 872 So.2d 519, cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005).
Prior to the trial in this matter, the State filed notice of its intent to use evidence of Defendant's use of checks stolen from Mr. Wilson's home as well as a driver's license bearing the name and address of Mr. Wilson with a picture of Defendant. The defense filed a motion in limine seeking to exclude this evidence. The trial court denied Defendant's motion just prior to the beginning of the trial.
Thus, this evidence was presented at trial, along with evidence establishing that Defendant used several of Mr. Wilson's checks to purchase merchandise after the burglary. These acts by Defendant formed an integral part of the charged offense of simple burglary of an inhabited *1162 dwelling. The evidence tended to prove that Defendant, after entering Mr. Wilson's home for the purpose of taking the checks, altered a driver's license and then passed the checks as if the checks were his own. Without this evidence, the State would not have been able to present a complete and cohesive narrative of Defendant's crime. The jury's ability to reach conclusions in this instance would have been limited without the full details of Defendant's acts after the burglary. The actions after the burglary constituted continuous acts by Defendant that should be viewed in tandem with the burglary itself for the purposes of providing a complete view of the charged offense. We conclude that the trial judge's ruling in allowing the admission of the testimony was proper in accordance with La. C.E. art. 404(B).
In considering the balancing test, the probative value of the evidence outweighed the prejudicial effect of the evidence. The evidence of the subsequent criminal acts of passing the stolen checks completes the narrative of what material benefit Defendant attempted to gain from his burglary. The probative value of the subsequent crimes, therefore, outweighs any prejudicial effect. This assignment of error is without merit.

Excessive Sentence
Defendant contends that the sentence imposed is excessive considering his first nonviolent offender status. Additionally, Defendant submits that the trial court failed to give proper consideration of the mitigating factors, including the fact that his incarceration will create undue hardship on his family as his mother is now caring for his children without his financial support. The State argues that the eight-year sentence for this offender is not excessive considering the circumstances of the crime and Defendant's apparent "turn to a life of crime," which included offenses committed after the instant offense.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App. 2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La. App. 2d Cir.1/28/04), 865 So.2d 284, writs denied, 04-0834 (La.3/11/05), 896 So.2d 57 and 04-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are Defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La. App. 2d Cir.4/22/04), 873 So.2d 747, writ denied, 04-2606 (La.6/24/05), 904 So.2d 728.
Second, a sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is *1163 considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Hogan, 480 So.2d 288 (La. 1985); State v. Bradford, 29,519 (La.App. 2d Cir.4/2/97), 691 So.2d 864.
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385. Prior to sentencing, a pre-sentence investigation was ordered; and, at Defendant's request, a sentencing hearing was held. Defendant also submitted a sentencing memorandum for consideration.
During the sentencing hearing, several witnesses testified on Defendant's behalf. Ronald Guin, a retired railroad engineer who worked with Defendant, testified that he knew Defendant to be a good, hard worker who had always been "straight up" and a good guy. Mr. Guin opined that Defendant is "a good guy that's made some bad decisions" and, thus, is deserving of a second chance.
Mr. C.L. Hicks, Jr. testified that he had known Defendant for all of his life. Mr. Hicks noted that Defendant's incarceration was causing a hardship on Defendant's children and his mother. Mr. Hicks also echoed the sentiment that Defendant had made some bad decisions because of some bad influences of the wrong people and wrong crowds.
Pastor Cary Munyon of the First United Methodist Church testified that he was acquainted with Defendant's family as Defendant's mother had been a member of his church for about four years. Pastor Munyon stated that Defendant's mother had been thrust into a position of caring for young children and was having a difficult time with the task. Pastor Munyon noted that Defendant's mother was prepared for the task, but it was hard on her. Echoing the familiar theme, Pastor Munyon stated that he believed that Defendant made a mistake and that there was hope for him. The pastor indicated that Defendant should be responsible for his actions, but that he was deserving of a second chance.
Defendant also made a statement during the hearing. He stated that he was the father of three children, that he had made some mistakes and that his children were suffering emotionally and financially as a result of his actions. He also wanted the court to be aware that he had been a hard worker and supporter of his family in the past. He discussed his two-year-old son, of whom he had sole custody. According to Defendant, his son lost his mother to drugs and a life of crime at the age of six months. Defendant indicated that he got involved with some people and made some bad decisions and stupid mistakes. In addition, Defendant filed a sentencing memorandum for the judge's consideration. After the sentencing hearing, the trial court sentenced Defendant to eight years at hard labor with credit for time served.
The record clearly shows that the trial court took cognizance of the appropriate factors set forth in La. C. Cr. P. art. 894.1. Regarding Defendant's criminal history, the trial court noted that Defendant was a first-felony offender with several misdemeanor convictions. The trial court also noted that Defendant had several pending charges as a result of arrests while he was out on bond for the instant charges. After being released on bond for the instant charges, Defendant was arrested in Caddo Parish for forgery and again in Red River Parish for criminal conspiracy associated with a methamphetamine lab and for possession *1164 of methamphetamine. In reviewing Defendant's social history, the trial court noted that Defendant was raised in a "normal family," graduated from high school and had been employed by the Kansas City Southern Railroad for the past 14 years. Prior to pronouncing sentence, the trial court noted that the victim, who was 88 years old, made a statement that was included in the pre-sentence investigation. The victim was quoted as saying, "I hope he gets what he deserves." The victim wanted Defendant to receive more time than his co-defendant, who received five years, and wanted restitution. At the time of the sentencing, restitution had in fact been made.
In further consideration of the sentencing factors articulated in Article 894.1, the trial court found that there is an undue risk that, during the period of a suspended sentence or probation, Defendant will commit another crime and that Defendant was in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution. The trial court found that a lesser sentence would deprecate the seriousness of Defendant's crime.
Other factors considered by the trial court were the age of the victim and that Defendant knew or should have known that the victim was vulnerable because of his advanced age. Also, the trial court found that Defendant used his position as a friend of the victim to facilitate the commission of the offense. The fact that there were other incidents after the commission of the instant offense, for which separate sentences had not yet been imposed, was also considered. According to the trial court, Defendant committed several other crimes, including forgery, identity theft and attempted theft in connection with the burglary of Mr. Wilson's home. In mitigation, the court noted that this was Defendant's first offense and that he had small children.
The trial court more than adequately reviewed the appropriate factors in tailoring this sentence to Defendant. It specifically considered the factors that Defendant now indicates should have earned him a lesser sentence. It is not necessary that the trial court give any factor a particular weight in fashioning Defendant's sentencing. This mid-range sentence is not grossly out of proportion to the seriousness of the offense, nor is it nothing more than a purposeless and needless infliction of pain and suffering. This sentence does not shock the sense of justice The trial court, therefore, did not abuse its discretion in fashioning this sentence.

CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant, Brady Alsup, are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] La. R.S. 14:62.2 states in part:

Simple burglary of an inhabited home is the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in Article 60.